Hon. T. L. NORVAL, } Judges.
Hon. J. J. SULLIVAN, }

Hon. ROBERT RYAN, }
Hon. JOHN M. RAGAN, } Commissioners.
Hon. FRANK IRVINE, }

---

STATE OF NEBRASKA, EX REL. WILLIAM J. BROATCH, v. FRANK E. MOORES.

FILED SEPTEMBER 23, 1898. No. 9249.

1. **Quo Warranto:** RIGHT TO TRIAL BY JURY. The history of quo warranto examined, and *held* not to furnish a basis for the determination of the question whether or not a jury trial, in this state, is demandable as a matter of right.

2. ———: ———. The provision of section 6 of article 1 of the constitution of Nebraska considered, and, in connection with provisions of the statute in existence at the time of its adoption, *held* not to entitle the respondent in a quo warranto proceeding to demand a jury for the trial of the issues of fact to be determined, as a matter of right.

3. **Supreme Court:** EXERCISE OF JURISDICTION. Where jurisdiction is in direct terms conferred upon the supreme court of this state, it will be exercised in such manner as constitutionally it may be exercised, even though no rules of procedure applicable to such a case have been provided by the legislature.

5 (1)

4. **Clerk of District Court: PUBLIC MONEY: CONVERSION: ELIGIBILITY.**
A clerk of the district court who, knowingly and intentionally, deposits public moneys received by him in payment of fines imposed in his court, together with other trust funds and his own private funds in a bank in one general account, to his own individual credit and, before he has paid said fines to the county treasurer as provided by law, knowingly, willfully, and intentionally draws from said bank all of the funds so deposited and uses the same for purposes other than the payment of said fines, thereby converts said public moneys to his own use, and is properly held in default, within the meaning of section 2, article 14, of the constitution of the state, and therefore ineligible to any office of trust or profit during the existence of such default.

ORIGINAL application in the nature of quo warranto to oust respondent from the office of mayor of the city of Omaha on the ground that he is ineligible within the meaning of section 2, article 14, of the constitution, providing that any person who is in default as collector and custodian of public money or property shall not be eligible to any office of trust or profit under the constitution or laws of the state. Heard on demand of respondent for a trial by jury, on exceptions to referee's findings against respondent, and on motion of relator to confirm said findings. *Judgment of ouster.*

See opinions for references to authorities.

*C. C. Wright, J. B. Sheean,* and *Frank T. Ransom,* for relator.

*John C. Wharton, Wharton & Baird, J. J. Boucher,* and *Greene & Breckenridge, contra.*

RYAN, C.

In this case there has already been a description and discussion of the issues, which thereby were greatly simplified. (*State v. Moores,* 52 Neb. 770.) There has now been a trial of these issues to a referee, who has reported his findings of fact and conclusions of law in accordance with the requirements of the order under which he was appointed.

Before discussing the exceptions and objections to these findings, we shall consider a question argued very strenuously and one which, not having then arisen, could not be discussed in the former opinion, and that is the right of respondent, upon demand, to a trial of the issues by a jury. The writ of quo warranto seems first to have been used in the year 1198 against the incumbent of a church to require him to show quo warranto he held the church. It was used for the purposes of extortion by the sovereigns of England until its scope was limited and its abuse checked by statute. The first of these statutes was known as the "Statute of Gloucester," from the place where parliament then sat. By its provisions there was an opportunity given the party affected to be heard at the coming of the king, or his justices in eyre. The defendant was still liable, however, to be summoned by a general proclamation at the hands of the sheriff, without any complaint or charge being tendered, and there were frequent delays in pronouncing judgment. To remedy these grievances there was passed the statute of 18 Edward I., in the year 1290, whereby pleas of quo warranto were required to be determined in the circuits of the justices. Probably writs of quo warranto fell into disuse about the sixteenth year of Richard II. The substitution therefor of the information in the nature of a quo warranto was attributed by Blackstone to the length of the process upon the proceeding in quo warranto, as well as to the fact that the judgment rendered was final and conclusive, even against the crown. The original writ of quo warranto was strictly a civil remedy, prosecuted at the suit of the king by his attorney general, and, in case of judgment for the king, the franchise was either seized into his hands, if of such a nature as to subsist in the crown, or a mere judgment of ouster was entered for the ejection of the usurper. There was no fine or other like punishment. The information was originally regarded as a criminal proceeding in which the usurpation of the office or franchise was charged as

a criminal offense, and the offender was liable, upon conviction, to a fine and imprisonment in addition to the loss of the usurped franchise. In speaking of an information in the nature of quo warranto in *Ames v. Kansas*, 111 U. S. 449, Waite, C. J., said: "Long before our revolution, however, it lost its character as a criminal proceeding in everything except form, and was 'applied to the mere purposes of trying the civil right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal only' (3 Bl. Com. 263; *King v. Francis*, 2 T. R. [Eng.] 484; Bacon, Abridgment, Title, Information d.; 2 Kyd, Corporations 439); and such, without any special legislation to that effect, has always been its character in many of the states of the Union. (*Commonwealth v. Browne*, 1 S. & R. [Pa.] 385; *People v. Richardson*, 4 Cow. [N. Y.] 102, note; *State v. Hardie*, 1 Ired. Law [N. Car.] 42, 48; *State Bank v. State*, 1 Blackf. [Ind.] 267, 272; *State v. Lingo*, 26 Mo. 496, 498.) In some of the states, however, it has been treated as criminal in form, and matters of pleading and jurisdiction governed accordingly. Such is the rule in New York, Wisconsin, New Jersey, Arkansas, and Illinois, but in all these states it is used as a civil remedy only. (*Attorney General v. Utica Ins. Co.*, 2 Johns. Ch. [N. Y.] 370, 377; *People v. Jones*, 18 Wend. [N. Y.] 601; *State v. West W. R. Co.*, 34 Wis. 197, 213; *State v. Ashley*, 1 Ark. 279; *State v. Roe*, 2 Dutch. [N. J.] 215, 217.)" A review of some of the cases in which the information in the nature of quo warranto is treated as in its nature a criminal proceeding is not without a certain value, for thereby it will be seen that, while the remedy is deemed a civil remedy, yet that, with the idea of an information there is associated such a leaning toward the analogies of criminal procedure that the holdings of these courts with reference to the right of trial by jury should be accepted with caution.

In *Donnelly v. People*, 11 Ill. 552, Caton, J., in the delivery of the opinion of the court with reference to the degree of precision requisite in indictments and informa-

tions, said: "The same certainty and technical precision are required in both, and the principal, if not the only, difference between them is, that an indictment is presented by the grand jury on their oaths while in informations in the nature of a quo warranto the court is informed of the facts by the state's attorney. In treating of these informations Sergeant Hawkins says: 'An information differs from an indictment in little more than this: that the one is found by the oath of twelve men, and the other is not so found, but is only the allegation of the officer who exhibits it. Whatsoever certainty is requisite in an indictment, the same, at least, is necessary, also, in an information, and consequently, as all the material parts of the crime must be precisely found in the one, so must they be precisely alleged in the other, and not by way of argument or recital.' (2 Hawkins, P. C. p. 369, ch. 26, sec. 4.)" In line with the above quoted language the supreme court of Illinois held that the omission of the words, "In the name and by the authority of the people of the state of Illinois," and "Against the peace and dignity of the same," was fatal to the information. The same ruling was made in *Wight v. People*, 15 Ill. 417; and in *Hay v. People*, 59 Ill. 94. As these three cases were cited in *Attorney General v. Sullivan*, 163 Mass. 446, hereafter to be considered, it will be well to remember the technical nicety which governs them.

In *State v. Davis*, 57 N. J. L. 203, Beasley, C. J., in the delivery of the opinion of the supreme court commenting upon the unjustifiable defense urged by the defendants, said: "It is not proper for this court to pass such a wrong as this without rebuke, and it is therefore ordered that judgment be entered that due process of law issue to remove these defendants from the offices into which they have intruded, and also that a fine of $200 be laid on each of said defendants for their malfeasance."

In *People v. Havird*, 2 Ida. 498, there was under consideration the constitutionality of an act passed by the legislature of that territory in which was embodied a

provision with reference to quo warranto, that: "Such action shall be heard and determined by the judge of the district court at chambers, and without the intervention of a jury, after due service of the summons and the expiration of time allowed by law for answering the complaint in a civil action; but no judgment shall be rendered in such action by default." In the discussion of this law there was the following language; "This law not only provides for supervision of elections and the correction of errors, but it goes further and places in the court unmistakable judicial powers. Section 541 provides 'that when a defendant against whom such action has been brought is adjudged guilty of usurping or intruding into, or unlawfully holding, any office, franchise, or privilege, judgment must be rendered that the defendant be excluded from the office, franchise, or privilege, and that he pay the costs of the action. The court or judge may also in its or his discretion, impose upon the defendant a fine not exceeding two thousand dollars.' Here are questions not merely as to the regularity of an election but also to the personal guilt or innocence followed by pecuniary consequences of no small moment. It aims not only at a civil remedy, but also at a criminal trial, personal punishment, and pecuniary fine and loss. The act of willful intrusion into a public office, to which one has not been elected, is declared to be a misdemeanor. (Revised Statutes Ida., sec. 6388.)" The principal matter discussed under these conditions of the statute was the denial of the right of trial by jury and the act was declared unconstitutional, probably for the most part, because of that denial.

The above references sufficiently illustrate the decided leaning of certain courts towards the practice ordinarily followed in the prosecution of criminals, and the danger that this bias may have influenced judgment as to the right of trial by jury. While some courts which incline towards the analogies afforded by the Code of Criminal Procedure do not evince so marked a leaning as above

indicated, they do go to the extent of insisting upon the right to have the issues determined by jury, apparently influenced by the consideration that the action being by information, the right of trial by jury naturally follows. These courts assert that the practice in England justifies the right to insist that the trial shall be by a jury—a contention not to be wondered at, when we consider the case of *Attorney General v. Sullivan, supra,* in which the right of jury trial was denied, but in which is found the following language and citation of numerous cases: "The practice in England, however, at common law as well as under the statutes, both in writs of quo warranto and in informations in the nature of a quo warranto, we think always has been to try issues of fact in the country by a jury, since juries were established, and this is true of many of the states of this country. (Bracton's Note Book 241, 862, 1666; Keilw. [Eng.] 151 pl. 47, 48, 49; 152 pl. 54; 1 Co. Lit. 155 (*a*) 155 (*b*); *Abbot of Strata Mercella's Case,* 9 Co. Rep. [Eng.] 24; *Attorney General v. Farnham,* Hardres [Eng.] 504; 3 Nelson, Abr. 42; *Rex v. Bennett,* 1 Strange [Eng.] 101; 14 Petersdorf, Abr. [Eng.] 97 *et seq.*; St. 18 Edw. I., 2 Co. Lit. secs. 494, 495; *Rex v. Higgins,* T. Raym. [Eng.] 484; *Darell v. Bridge,* 1 Wm. Bl. [Eng.] 46; *Rex v. Cambridge,* 4 Burr. [Eng.] 2010; *King v. Francis,* 2 T. R. [Eng.] 484; *King v. Mein,* 3 T. R. [Eng.] 596; *People v. Richardson,* 4 Cow. [N. Y.] 97, 100, note; *United States v. Addison,* 6 Wall. [U. S.] 291; *People v. Albany & S. R. Co.,* 57 N. Y. 161; *Buckman v. State,* 24 L. A. R. [Fla.] 806, note; *Van Dorn v. State,* 34 Fla. 62; *People v. Sackett,* 14 Mich. 243; *People v. Doesburg,* 16 Mich. 133; *Harbaugh v. People,* 33 Mich. 241; *Donnelly v. People,* 11 Ill. 552; *Wight v. People,* 15 Ill. 417; *Hay v. People,* 59 Ill. 94; *People v. Golden Rule,* 114 Ill. 34; *People v. Rensselaer & S. R. Co.,* 15 Wend. [N. Y.] 113, 30 Am. Dec. 33 and note.)"

We have examined such of the above citations of English text writers and adjudged cases as are within our reach, and have found in each of them a mere mention of

the fact that a jury trial had been had, but no discussion of the foundation of the right thereto. In the concluding part of the opinion in *Attorney General v. Sullivan, supra,* it was said: "The modern practice has been to try such an information as this without a jury, although it does not appear in the cases that a jury was demanded. (*Commonwealth v. Allen,* 128 Mass. 308; *Commonwealth v. Swasey,* 133 Mass. 538; *Commonwealth v. Harriman,* 134 Mass. 314; *Attorney General v. Crocker,* 138 Mass. 214.)" As might be expected, the inferences which should be drawn from facts accompanying the evolution and use of the information in the nature of a quo warranto have been by no means uniform. Of the cases which deny that the right of trial by jury of informations in the nature of a quo warranto existed at common law, there is none, perhaps, in which is more vigorously stated the grounds for entertaining this view than *State v. Johnson,* 26 Ark. 281 and we shall therefore quote from the opinion therein delivered by McClure, C. J., this language: "Whether the right of trial by jury ever existed as a matter of right in quo warranto, is not a matter easily determined by direct precedent. The respondent claims that such is the uniform practice, not only in this country, but in England, and in support of that position quite a number of authorities have been submitted to our consideration. On a careful examination of the authorities cited, we have found them to apply to informations in the nature of a quo warranto, the former being a criminal prosecution and the latter a proceeding upon a writ in the nature of a writ of right, which partakes more of what is now known as a summary proceeding than a 'case at law.' The right of trial by jury, at common law, never existed in equitable proceedings, in admiralty or summary proceedings, or proceedings against officers of a civil nature, nor did it exist in cases where private property was taken for public use, and yet in all these proceedings, questions of fact, involving the tenure to property in untold amounts, are adjudicated upon by the courts, without

the intervention of a jury. So far as we can now trace the right of trial by jury, at common law, it did not extend to equitable actions, admiralty or summary proceedings, nor in cases where private property was taken for public use, nor in proceedings in rem, nor in civil proceedings against public officers; and this proceeding is nothing more or less than a civil proceeding against a public officer. By Magna Charta, it is declared that 'no freeman shall be arrested or imprisoned, or deprived of his freehold, except by the regular judgment of his peers or the law of the land.' In the seventeenth year of the reign of King John, at Runnymede, these concessions were made by the crown, and from that time forward, to some extent, the rights of Englishmen have been determined by the concession then made. King John's construction of the concession was that it did not protect the 'goods and chattels,' and, as an evidence of this, we have but to refer the unread to history of the time, and it will be found that armed forces were sent against the secret enemies of the king, and they were despoiled of their goods without observing any form of law. Langton and his associates, and many others, were thrown into prison and despoiled of their goods, without the intervention of a jury, notwithstanding Magna Charta. (Ling. His. Eng. vol. 2, 225 note.) So far as our research has extended, the right of trial by jury, at common law, only extended to criminal prosecutions and in actions where a freehold or goods and chattels were in dispute. The term 'goods and chattels' includes personal property, choses in action, and chattels real. The right to an office is neither personal property, nor a chose in action, nor chattels real, in the sense used at law. In information in the nature of a quo warranto it is expressly provided by an act of parliament (3 Geo. II., ch. 25) that a jury shall be struck before a proper officer on the demand of the king or the respondent. This statute was passed for the special purpose and to the end that his majesty's courts at Westminster might be provided with juries to

try questions of fact. If this right existed before this time it was certainly a work of supererogation on the part of parliament to enact the law, and the inference to be drawn from this fact is that, prior to the date of the statute, the issues of fact were tried by the court even in cases of informations in the nature of quo warranto, which, at best, is but little more than a summary proceeding to ascertain the right to an office.  *  *  *  We have already stated that when the members of the convention framed and adopted the present constitution they were well aware that this court was not to have a jury and that the jurisdiction in these writs was conferred with a full knowledge of this fact. The proceeding at law is not a criminal action, and yet, from the tearful and pathetic argument of the counsel, one would be led to suppose that the respondent was being tried for a murder or treason, and the argument is based upon the false assumption that his client is to be hanged without the intervention of a jury. The object of this proceeding is to require the respondent to come into court and show the title to the office the functions of which he has been exercising. If he has title, no harm can befall him. If he has no title, he is simply ousted from the office whose functions he has usurped. No penalty, imprisonment, or fine is imposed, no matter what way the judgment goes. It has been frequently held that right of trial by jury, at common law, never extended to cases of defaulting or delinquent officers of the government (*Adams v. State*, 2 Stew. [Ala.] 231; *Harris v. Wood*, 6 T. B. Monroe [Ky.] 641, Hardin's Rep. [Ky.] 5; *Boring v. Williams*, 17 Ala. 516); and the states in which these holdings have been made have denied a jury, when demanded, on the sole ground that in actions against the public officers, the right of trial by jury did not exist at common law, if the actions were not of a criminal nature. Believing this to be the correct distinction, we are unable to see wherein the denial of a jury would contravene the right of trial by jury as it existed at common law or as it existed at

the adoption of the constitution. If we were to consult our own conscience, or desired to shirk the duty imposed on us by the constitution, we would at once order a jury, to dispose of this question; but inasmuch as neither the constitution nor the legislature has provided this court with a jury or the means of obtaining one, and inasmuch as there would be no court in the state with jurisdiction to protect the officers of the state from usurpation if this court were to refuse to exercise the jurisdiction conferred, we feel it to be our duty, under all the circumstances, to overrule the motion for a jury."

Other courts have sanctioned the views above expressed, but there is a limit which forbids reference to them. From the review of this question already indulged in, to perhaps an unwarrantable length, it is clear there exists such uncertainty as to the rule at common law that, if possible, the problem should be solved by resort to fixed principles rather than the disputed teachings of uncertain precedents.

It is provided in section 2, article 6, of the constitution of this state, that the supreme court "shall have original jurisdiction in cases relating to the revenue, civil cases in which the state shall be a party, mandamus, quo warranto, habeas corpus, and such appellate jurisdiction as may be provided by law." By section 13, chapter 19, Compiled Statutes, the appellate and final jurisdiction of the supreme court is defined to be "of all matters of law, fact, or equity, where the rules of law or principles of equity appear from the files, exhibits, or records of said court to have been erroneously determined." It is clear that the jurisdiction of the court with reference to informations in the nature of a quo warranto depends, not upon the fact that such proceedings are in their nature criminal, but upon the express language of the constitution. The extended review of the history of the remedy under consideration will not have been entirely useless if it has prepared us to accept the proposition that the legislature wisely provided, as it did in section 2, Code of Civil

Procedure, that there shall be but one form of action which shall be called a civil action, and the special provisions relating to quo warranto which we shall now consider. By section 1, chapter 71, Compiled Statutes, it is provided by whom an information in the nature of a quo warranto may be filed, and in section 4 it is provided that the proceedings in quo warranto shall be regulated by title 23 of said Code. By section 709 of the Code, just referred to, it is provided that "the defendant shall appear and answer such information in the usual way, and issue being joined it shall be tried in the ordinary manner." The provisions of sections 280 and 281, Code of Civil Procedure, are as follows:

"Sec. 280. Issues of law must be tried by the court unless referred as provided in section two hundred and ninety-eight. Issues of fact arising in actions for the recovery of money, or of specific, real, or personal property, shall be tried by a jury, unless a jury trial is waived or a reference be ordered, as hereinafter provided.

"Sec. 281. All other issues of fact shall be tried by the court, subject to its power to order any issue or issues to be tried by a jury or referred as provided in this Code."

These sections constituted a part of our Code of Civil Procedure at the time of the adoption of the constitution of this state, in which, as section 6 of article 1, known as the "bill of rights," there were the following provisions: "The right of trial by jury shall remain inviolate, but the legislature may authorize trial by a jury of a less number than twelve men in courts inferior to the district court." A consideration of these provisions leads unavoidably to the conclusion that in refusing a jury trial to the respondent no constitutional right of his was denied, as is illustrated by the opinion of the court in *Sharmer v. McIntosh*, 43 Neb. 509; *Omaha Fire Ins. Co. v. Thompson*, 50 Neb. 580, and *Mayer v. Wilkinson*, 52 Neb. 764. For reasoning in the same line in quo warranto cases see *State v. Doherty*, 16 Wash. 382.

Intimately connected with the proposition just dis-

cussed is the argument of respondent that the court has
no power to refer the issues in this case for findings by
a referee, and this argument is based upon the assump-
tion that this court can refer only such cases as by virtue
of statutory provisions may be referred by the district
court. The constitution has, as we have already seen,
conferred upon this court jurisdiction in cases of quo
warranto. The legislature has not provided any. rules
of procedure by which we are to be governed in actions
of this nature. It has been customary for this court to
refer matters involving the exercise of its original juris-
diction from its organization. If, as requested, we had
ordered the impaneling of a jury, we should have acted
as independently of express legislative rules as we have
done in the appointment of a referee. Where the con-
stitution in direct terms devolves upon this court a duty
to be performed, the mere omission of the legislature to
point out the method of performance will not prevent
the performance of such duty in such manner as this
court, with due deference to constitutional provisions,
shall find itself bound to adopt. This fact is illustrated
in the case entitled *In re Petition of Attorney General*, 40
Neb. 402. We are satisfied that, in refusing a jury and
in referring the issues for findings of fact and of law, no
constitutional or other right of the respondent was de-
nied, and that this court acted strictly within the powers
necessarily implied by the constitutional imposition
upon it of original jurisdiction in quo warranto.

In the opinion already filed the matters which were
held to be properly for trial as questions of fact were
thus indicated: "The answer discloses that prior to re-
spondent's election he had paid to the county treasurer
all the fines and penalties received by him, except the
sum of $1,818.83. If this last named amount, or any
portion thereof, was intentionally, willfully, or corruptly
retained by respondent, he was ineligible to the office in
question. Of the items which go to make up the said
sum, the answer states, in effect, that $364 were never

received by respondent or his deputy; that the item of
$200 was paid during the serious illness of respondent
to his deputy, and that the principal was unaware of
such payment, or the money would have been covered
into the treasury; and that the further sum of $500 was
retained and held upon the agreement, request, and de-
mand of the county attorney and the attorney for the
city of Omaha and the board of education that the same
be held pending a controversy over the ownership of the
money, and that respondent was at all times ready and
willing to pay the same to the county, and would have
done so but for such contention and agreement.  Those
matters pleaded were sufficient to relieve him from being
a defaulter as to such items.  *  *  *  The only doubt
the writer has entertained as to the sufficiency of this
answer has been with reference to the excuse set up for
not having paid over before election the remainder of
said sum of $1,818.83, to-wit, $754.83.  It is admitted
that the items which go to make up said sum were paid
to the respondent personally in sums not exceeding $100,
and that he overlooked such payments until after the
expiration of his term, and, with reasonable diligence,
the same could not have been discovered by him prior to
the date of the payment thereof to the county.  If there
were no other averments contained in the answer we
should hesitate before deciding that the pleading is suf-
ficient.  But as it is positively alleged, and by the de-
murrer admitted to be true, that it was never the inten-
tion of the respondent to, and he did not in fact, appro-
priate, any portion of the funds collected to his own use,
and that he did not willfully or knowingly withhold any
portion thereof, but paid the same to the county treas-
urer as rapidly and as soon as he was cognizant that he
had received the money, we are constrained to the opin-
ion that the demurrer to the answer should be overruled,
with leave to the relator to reply, as he has signified a
desire so to do."  (State v. Moores, 52 Neb. 791.)  A reply
was accordingly filed which negatived the averments

above noted as having been admitted by the demurrer to the answer to be true, and there was a trial of the issues thus made up, and findings of fact and law therein adverse to the respondent. It is to these findings that exceptions have been filed by the respondent, and for the confirmation of them that a motion has been presented by the relator. There is no question made as to the correctness of the findings of the referee that Moores was elected clerk of the district court of Douglas county, and filled that office for two successive terms, the first of which began in January, 1888, and the last ended on January 9, 1896; that on April 20, 1897, he received a majority of the votes cast for mayor of the city of Omaha for the term which began May 10, 1897, and duly qualified as such mayor; and that the relator yielded up possession of said office only when required so to do by due order of the proper district court. The findings which follow those above summarized were as follows:

"8. The respondent, Frank E. Moores, as clerk of the district court of said Douglas county, during his two terms of office, collected and received certain fines and penalties aggregating the sum of $6,119.91, which had been imposed by the district court of said Douglas county upon various offenders against the laws of the state of Nebraska.

"9. The respondent had accounted for and paid over to the county treasurer of said county, prior to the 9th day of May, 1897, of fines and penalties so collected and received, the sum of $4,221.36 and no more; and that at the time of his election, on the 20th day of April, 1897, the respondent had not accounted for nor paid over to the said county treasurer the sum of $1,898.55 of the fines so as aforesaid received by him.

"10. On the 9th day of May, 1897, the respondent paid to the county treasurer of said county a part of said fines, to-wit, the sum of $1,818.83, but failed and neglected to pay the balance of said sum, to-wit, $79.72, which amount is still unaccounted for and unpaid.

"11. The respondent had no actual knowledge, until after expiration of his last term of office of clerk of the district court, that the statute required him to pay all fines to the county treasurer of said county within ten days from receipt thereof, but he did understand at all times that it was his duty to make a report at the end of each quarter, and pay over to said county treasurer all of the fines and penalties received by him during said quarter.

"12. The first report and payment made to said county by respondent of moneys collected by him was dated November 24, 1888, and purported to cover a period from January 5, to September 30, 1888. Said report and payment included $145 witness fees, $74 trial fees, and $525 fines and penalties. Prior to making of said report the respondent had collected and received the following fines imposed by said district court of Douglas county, to-wit: $14 paid by Mike Meany, March 27, 1888, Docket 7, page 115; $100 paid by Charles White, March 21, 1888, Docket 7, page 183; $100 paid by Buck Copeland, March 21, 1888, Docket 7, page 185; $150 paid by ——— Cook, March 21, 1888, Docket 7, page 186. All of said fines were omitted from said report, and none of them were ever reported or paid to said county until May 9, 1897.

"13. May 7, 1889, the second report and payment were made by respondent, which purported to cover a period from September 30, 1888, to April 1, 1889, and included and covered $285 trial fees and $250 fines. During this period the respondent had collected and received $29.72 on a fine imposed by the district court of Douglas county on one August Uthof, which amount was paid to respondent October 23, 1888, but the same was omitted from said report and no part thereof has ever been reported or paid to said county by respondent.

"14. July 20, 1889, the third report and payment were made by respondent, and purported to cover the quarter ending June 30, 1889, and included $170 fines and $181 trial fees.

"15. October 26, 1889, the respondent's fourth report was made, purporting to cover the quarter ending September 30, 1889, and included trial fees to the amount of $161, but no fines.

"16. February 7, 1890, the fifth report was made by respondent, purporting to cover the quarter ending December 31, 1889, which report included only $104 trial fees and no fines.

"17. April 2, 1890, the sixth report was made by respondent, purporting to cover the quarter ending March 31, 1890, and which included only trial fees to the amount of $93 and no fines.

"18. October 10, 1890, the seventh report and payment were made by respondent, purporting to cover the period for which no reports had been previously made, up to and including September 30, 1890, which report included $242 trial fees and $105 fines. This sum of $105 was made up of four fines, one of $25, paid to respondent March 17, 1890; one of $5 paid to respondent January 22, 1890; one for $25 paid to respondent April 1, 1890; and one for $50 paid April 3, 1890.

"19. January 23, 1891, the eighth report and payment were made by respondent, purporting to cover the quarter ending December 31, 1890, and included $30 fines and $153 trial fees. On the 27th day of September, 1890, the respondent collected of John Paegler a fine of $50 imposed by the district court of said county, which amount was omitted from said report and not reported or paid to said county until May 9, 1897.

"20. April 29, 1891, the ninth report was made by respondent, purporting to cover the quarter ending March 31, 1891, which included trial fees to the amount of $88 and no fines.

"21. February 17, 1892, the tenth report and payment by respondent were made, purporting to cover the period for which no previous reports had been made and up to January 1, 1892. It included $156.47 fines and $314 trial fees. From this report was omitted a fine of $3.53 paid

6

to respondent by Mrs. Fenn, June 4, 1891, which amount was not reported or paid by respondent to said county until May 9, 1897.

"22. July 6, 1892, the eleventh report and payment were made by respondent, said report being dated July 1, 1892, purporting to cover the period for which no reports had been previously made, up to and including June 30, 1892, and included $386 fines and $231 trial fees. From this report was omitted a fine of $25 imposed by the district court of Douglas county upon one Ernest Stuht; and which was paid to respondent May 21, 1892. This fine was never reported or paid to said county until May 9, 1897.

"23. September 27, 1892, the twelfth report and payment were made by respondent, purporting to cover the quarter ending September 30, 1892, and included $300 fines and $125 trial fees. From this report was omitted two fines of $100 each, imposed upon David Rich and Edson Rich, respectively, by the district court of said county, and paid to respondent July 23, 1892. No part of these fines was ever reported or paid to said county until May 9, 1897.

"24. January 1, 1893, the thirteenth report and payment were made by respondent, purporting to cover the quarter ending December 31, 1893, and included $28 fines and $232 trial fees. From this report were omitted fines to the amount of $88.30, as follows: $30 paid by A. L. Creighton, October 8, 1892, Docket 31, page 35; $3.30 paid by Chester Mitchell, November 12, 1892, Docket 32, page 384; $10 paid by Henry Hagedorn, November 17, 1892, Docket 33, page 154; $15 paid by Charles Shartow, November 23, 1892, Docket 33, page 165; $30 paid by Fred Pluyler, November 14, 1892, Docket 34, page 9. None of said fines were reported or paid to the county until May 9, 1897. Two other fines—one for $25, Docket 36, page 82, and one for $20, Docket 38, page 92—paid to respondent October 11, 1892, were also omitted from said report, but were afterward, to-wit, on the 6th day of

April, 1895, reported and paid to said county by respondent.

"25. March 31, 1893, the fourteenth report was made by respondent, purporting to cover the quarter ending March 31, 1893. No fines were included in said report, but $88 in fines had been collected and received by respondent during the said quarter, as follows: $80 paid by Ed J. Dee, February 18, 1893, Docket 34, page 320; $3 paid by Simon Levy, March 18, 1893, Docket 36, page 78; $5 paid by Henry A. Homan, March 31, 1893, Docket 36, page 274. None of these were reported or paid to the county until May 9, 1897.

"26. June 30, 1893, the fifteenth report was made by respondent, purporting to cover the quarter ending June 30, 1893. No fines were included in this report, but eleven fines, amounting to $350, had been collected by the respondent during this quarter, as follows: $15 paid by Mrs. Foster, May 25, 1893, Docket 33, page 149; $25 paid by John Shelby, May 29, 1893, Docket 34, page 5; $5 paid by Ed Tuttle, May 26, 1893, Docket 34, page 135; $10 paid by George Hicks, April 6-11, 1893, Docket 36, page 25; $75 paid by William Weabeseak, June 29, 1893, Docket 36, page 83; $5 paid by Frank Hauser, May 26, 1893, Docket 36, page 283; $100 paid by Bertie Mann, May 25, 1893, Docket 37, page 253; $10 paid by John Mathews, May 8, 1893, Docket 37, page 8; $50 paid by John Chaplovski, June 20, 1893, Docket 37, page 379; $5 paid by Will Gresham, June 27, 1893, Docket 38, page 91; $50 paid by Henry C. Hitt, June 17, 1893, Docket 38, page 154. None of said fines were reported or paid to Douglas county until May 9, 1897.

"27. October 1, 1893, the sixteenth report was made by respondent, purporting to cover the quarter ending September 30, 1893, and included trial fees to the amount of $124. No fines were included in this report, but five fines, amounting to $130, had been collected by respondent during said quarter, as follows: $25 paid to respondent on September 28, 1893, and reported and paid by him

to said county April 6, 1895; $1 paid by George Russell, July 21, 1893, Docket 34, page 26; $25 paid by S. Coyle, July 11, 1893, Docket 36, page 75; $75 paid by Robert Parks, July 3, 1893, Docket 37, page 278; $4 paid by Henry Martin, July 22, 1893, Docket 38, page 205. The last four of the above described fines were not reported nor paid to said county until May 9, 1897.

"28. January 1, 1894, the respondent made his seventeenth report, purporting to cover the quarter ending December 31, 1893, and included trial fees to the amount of $248, but failed to include five fines, amounting to $375, which were collected and received by respondent, as follows: $10, October 25, 1893, Docket 39, page 378; $5, October 19, 1893, Docket 40, page 171; $100 paid November 11, 1893, Docket 40, page 326; $250 paid November 15, 1893, Docket 40, page 359. These four fines were reported and paid to said county by respondent April 6, 1895; $10 paid by Dan Sherroy, October 11, 1893, Docket 36, page 81. This last mentioned fine was not reported or paid to said county until May 9, 1897.

"29. April 1, 1894, the eighteenth report was made by respondent, purporting to cover the quarter ending March 31, 1894, and included trial fees to the amount of $230.20. No fines were included in this report, but three fines, amounting to $110, were collected by respondent during said quarter, as follows: $50 paid March 12, 1894, Docket 40, page 73; $20 paid March 12, 1894, Docket 41, page 302; $40 paid February 26, 1894, Docket 42, page 303. None of said fines were reported and paid to said county until April 6, 1895.

"30. July 1, 1894, the nineteenth report was made by respondent, purporting to cover the quarter ending June 30, 1894, and included only trial fees, $309.50. No fines were included in this report. The respondent had, however, collected and received during said quarter three fines, amounting to the sum of $435, as follows: $400 paid May 19, 1894, Docket 43, page 385; $25 paid June 22, 1894, Docket 44, page 72. Neither of said fines were re-

ported or paid to said county until April 6, 1895; $10 paid by Frank Dolezal, May 29, 1894, Docket 43, page 394. Said last mentioned fine was not reported or paid to said county until May 9, 1897.

"31. November 1, 1894, the twentieth report was made by respondent, purporting to cover the quarter ending September 30, 1894, and included trial fees to the amount of $241, but no fines. Four fines, amounting to $975, were collected and received by the respondent during said quarter, as follows: $400 paid July 14, 1894, Docket 43, page 254; $25 paid October 2, 1894, Docket 46, page 312; $50 paid October 11, 1894, Docket 46, page 329—said three fines were not reported and paid to said county until April 6, 1895; $500 paid by Michael Wallenz, October 27, 1894, Docket 46, page 232. Said Wallenz fine was not reported or paid to said county until May 9, 1897.

"32. No fines were reported or paid by respondent to said county between January 1, 1893, and April 6, 1895. On said last mentioned date the respondent reported and paid to said county seventeen fines, amounting to $1,500, fifteen of which had been received by him during that period, and two on October 11, 1892; but there were twenty-one fines, aggregating the sum of $1,063, collected and received by respondent during said period on the dates specifically set forth in the foregoing findings, which were omitted from said report and not reported or paid to said county until May 9, 1897.

"33. April 20, 1895, respondent reported and paid to said county four fines, amounting to $470, but failed to report or pay two fines, amounting to $50, which had been collected by him on April 15, 1895, as follows: $25 paid by Henry Jippi, April 15, 1895, Docket 49, page 360; $25 paid by Nels Borg, April 15, 1895, Docket 49, page 360. Neither of said fines has ever been reported by respondent or paid to said county.

"34. September 23, 1895, respondent reported and paid to said county one fine of $300, but omitted from said report two fines, amounting to $25, which had been col-

lected by him, as follows: $15 paid by Ed Tuttle, June 25, 1895, Docket 39, page 377; $10 paid by Richard Burdish, July 20, 1895, Docket 46, page 306. Neither of said fines was reported or paid to said county until May 9, 1897.

"35. All fines collected and received by defendant, as hereinbefore found, were receipted for upon the appearance dockets, and the amount so received was usually entered upon a 'scratcher' or blotter, kept by the respondent, to show cash received and disbursed, and no other memorandum or account of said fines was kept.

"36. None of the foregoing reports, made by respondent, were personally prepared by him. All of said reports were prepared by a clerk or deputy and handed to respondent, who signed them all. No comparison of any of said reports with the dockets or said 'scratcher' or blotter was made by respondent personally to ascertain whether they were correct.

"37. The 'scratchers' or blotters in which said fines and cash account were kept were destroyed prior to the time of the hearing of this case.

"38. No report or payment of fines was made to said county by respondent after September 23, 1895, until May 9, 1897. On May 7, 1897, respondent's attorney procured of the county attorney of Douglas county an itemized statement of fines, which, it was claimed, the respondent had collected and failed to report or pay to said county, and on May 9, 1897, respondent paid to the county treasurer of said county $1,818.83, being the full amount of said fines shown by said statement and being all of the fines which the evidence shows were collected by respondent, and not, theretofore, paid to said county, except the sum of $79.72 which was received by respondent on fines of August Uthof, Henry Jippi, and Nels Borg, as hereinbefore found, which fines and amount were not included in said statement nor paid by the respondent.

"39. The respondent personally collected, received, and receipted for a large number of the fines paid into

his office between January 1, 1893, and April 6, 1895, and knowingly, wilfully, and intentionally failed to include in any of the reports made by him during said period any of said fines, and knowingly, wilfully, and intentionally failed to report or pay to said county any of said fines, which amounted in the aggregate to $2,518, until April 6, 1895.

"40. The respondent did not keep public funds separate and apart from his private funds, but mixed them together indiscriminately. He received from his predecessor between $20,000 and $30,000 in trust funds which had come into the hands of said predecessor as clerk of the district court of said county. This amount respondent deposited to his own credit in the Merchants National Bank of Omaha, and thereafter carried but said single bank account, in which he deposited the funds, both public and private, received by him, including fines and penalties, and upon which account he drew checks for disbursements, whether made for a public or a private purpose. The only exception to this method of keeping the funds was the placing by respondent, in a comparatively few instances, certain funds in various banks and taking certificates of deposit therefor. In nearly every one of said cases the deposit was made and the certificate taken by order of the court, or for funds received by respondent in a particular case, and in all instances said certificates were either held for, or paid out in, the particular cases in which they were received, or their proceeds were deposited in said general account in the Merchants National Bank.

"41. Between January 1, 1896, and April 20, 1897, the respondent knowingly, wilfully, and intentionally withdrew, for purposes other than the payment of any of said fines, all of the funds in his said general account in said Merchants National Bank. The condition of said account on the morning of each of various days during said period was as follows: January 1, 1896, balance in account, $351.25; January 4, 1896, overdrawn, $848.50; on

January 7, 1896, respondent borrowed $10,000 and deposited the same in said account to replace funds which he had used to pay his help; January 9, 1896, balance in account, $2,844.48; February 1, 1896, balance in account, $358.89; March 1, 1896, balance in account, $15.17; April 1, 1896, balance in account, $80.17; May 1, 1896, balance in account, $263.88; June 1, 1896, balance in account, $146.99; July 1, 1896, balance in account, $233.53; August 1, 1896, balance in account $35.20; September 1, 1896, balance in account, $16.21; October 1, 1896, balance in account, $61.36; November 1, 1896, overdrawn, $12.82; December 1, 1896, balance in account, $12.82; January 1, 1897, overdrawn, $14.20; February 1, 1897, balance in account, $179.13; March 1, 1897, balance in account, $17.83; April 1, 1897, balance in account, $125.62; April 20, 1897, balance in account, $596.91; May 9, 1897, overdrawn, $369.96.

"42. The balance of $596.91 in respondent's said bank account on April 20, 1897, was no part of the fines so as aforesaid collected and retained by respondent, but the same was understood and considered by respondent to be his private funds, and the same was all drawn out and used by respondent for purposes other than to pay any of said fines prior to May 9, 1897.

"43. On and prior to April 20, 1897, the respondent had appropriated and converted to his own use all of the said $1,898.55 in fines which he had collected and received as clerk of the district court of said county and had failed to account for and pay over to said county as hereinbefore found, and on May 9, 1897, the respondent had none of said fines, but on said day borrowed of one John A. Creighton the whole of the amount paid to the county treasurer thereon, to-wit, the sum of $1,818.83, and respondent gave to said John A. Creighton his promissory note therefor.

"44. On the 21st day of March, 1888, fines assessed against Charles White, Buck Copeland, and —— Cook by the district court of Douglas county for gambling,

amounting in the aggregate to $350, were paid into the office of the clerk of the district court of said county, and receipts thereof were duly written on the appearance docket of said office, wherein said cases were recorded, by V. M. Mackey, who was then the respondent's duly authorized deputy, which receipts were unsigned. The fact that said unsigned receipts were in said dockets was called to the attention of respondent by the expert, Points, in the summer or fall of 1895. Respondent made no effort to ascertain whether said fines had been paid to him or into his office until after he paid the same to the county treasurer on the 9th day of May, 1897.

"45. On the 27th day of March, 1888, the respondent, by his duly authorized deputy, V. M. Mackey, collected and received of one Mike Meaney the sum of $14 on a fine imposed upon him by the district court of said county for resisting an officer, and a receipt for said fine was duly entered and signed by said Mackey on the records of said office. The attention of the respondent was called to this receipt by the expert, Points, in the summer or fall of 1895. Respondent made no effort to ascertain whether said money had been paid until the 9th day of May, 1897, at which time he paid the same to the county treasurer of said county.

"46. On the 23d day of July, 1892, the respondent, by his duly authorized deputy, A. Stere, Jr., collected and received of David Rich and Edson Rich $230, being fines of $100 each and $30 costs, imposed upon said parties by the district court of said county for contempt, and a receipt therefor was on said day duly entered on the appearance docket of the office of the district court where said contempt cases were entered and recorded. At the time said fines were collected the respondent was in Europe, where he remained about two months. On his return from Europe respondent learned that said $230 fines and costs had been paid into his office as aforesaid, and personally repaid the said Edson Rich the $30 costs so collected, and took the receipt of said Edson Rich there-

for upon the appearance docket in said case, which receipt is dated February 18, 1893.

"47. On the 27th day of October, 1894, the respondent personally collected and received of one Michael Wallenz a fine of $500, which had been imposed upon him by the district court of said county for selling liquor without a license. In the latter part of the year 1894 or fore part of the year 1895 the city attorney of the city of Omaha notified respondent that said fine and all others of a like nature should be paid to the city treasurer, and not to the county treasurer. The county attorney of said Douglas county denied this proposition and insisted that the same should be paid to the county treasurer of the said county. Respondent declined to pay said fine to either the county or city treasurers until said dispute was settled. On the 9th day of May, 1897, he was first informed by the city attorney that the city released all claims on said Wallenz fine and the respondent on said day paid the amount thereof to the county treasurer of said county.

"48. The respondent did not retain or keep the money so received for said Wallenz fine, nor the amount thereof until the same was paid, but said respondent did, prior to the 20th day of April, 1897, knowingly, wilfully, and intentionally appropriate and convert all of the same to his own use, and on the 9th day of May, 1897, the respondent did not have said fine or any part thereof, but borrowed all of the money with which to pay the same to the county treasurer as aforesaid.

"49. A competent accountant could have ascertained from the records of Douglas county all the fines collected and received by respondent and unaccounted for at the close of his second term as clerk of the district court of said county, as hereinbefore found, in two months, and, with reasonable diligence, the respondent could have discovered said fines, and that they were unpaid, long before the 20th day of April, 1897.

"50. The respondent collected and received, between

January 1, 1893, and October 1, 1894, thirty-five fines, exclusive of the Michael Wallenz fine, aggregating the sum of $2,018, nearly all of which were received and receipted for by the respondent personally. In failing to report or to pay over to said county any of said fines before April 6, 1895; in omitting from his report and payment of fines made April 6, 1895, twenty of the thirty-five fines so collected; in withdrawing and converting to his own use all of the funds in the bank account in which said fines were placed, without first ascertaining whether any of the same remained unpaid; and in failing to pay any of said twenty fines to said county until the 9th day of May, 1897, the respondent was guilty of such flagrant disregard of duty as to fairly justify the inference that his conduct in failing to account for and pay over said fines was wilful and corrupt.

"51. I find that before and at the time the respondent, Frank E. Moores, was elected to the office of mayor of the city of Omaha, on the 20th day of April, 1897, he was in default as collector and custodian of public money, and was ineligible to the said office of mayor of the city of Omaha.

"FINDINGS OF LAW.

"First. The office of mayor of a city of the metropolitan class is an office of profit and trust under the laws of this state.

"Second. A clerk of the district court, as to moneys received by him in payment of fines and penalties imposed in said court, is a collector and custodian of public money within the meaning of section 2, article 14, of the constitution.

"Third. The word 'eligible' relates to the capacity to be elected or chosen to an office as well as to hold office.

"Fourth. The statute requires a clerk of the district court to account for and pay over to the county treasurer all fines collected and received by him within ten days from the receipt thereof. This provision is mandatory, and a failure to comply with it makes such clerk civilly liable on his official bond.

"Fifth. The term 'default,' as used in said section 2, article 14, of the constitution, implies more than a mere civil liability. To constitute a default within the meaning of said section, there must exist on the part of a collector and custodian of public money a willful omission to account and pay over, with a corrupt intention, or such a flagrant disregard of duty as to fairly justify the inference that his conduct was wilful and corrupt.

"Sixth. All moneys received by a clerk of the district court in payment of fines and penalties imposed in said court are, when in his hands, trust funds of which he is the mere custodian and not the owner. He has no right to loan, invest, or in any manner convert to his own use any part of said funds, and any such loaning, investment, or conversion of same is by section 124 of the Criminal Code declared to be a felony.

"Seventh. A clerk of the district court who knowingly and intentionally deposits public moneys received by him in payment of fines imposed in his court, together with other trust funds, and his own private funds, in a bank in one general account, to his own credit, and before he has paid said fines to the county treasurer, as provided by law, knowingly, wilfully, and intentionally draws from said bank all of the funds so deposited, and uses the same for purposes other than the payment of said fines, thereby converts said public money to his own use, and is in default within the meaning of section 2, article 14, of the constitution, and ineligible to any office of trust or profit under the constitution or laws of this state during said default.

"Eighth. I find at the time of his election on April 20, 1897, the respondent was in default as collector and custodian of public money, and ineligible to the office of mayor of the city of Omaha, and that the relief prayed for by complainant should be granted.

"E. J. CLEMENTS, *Referee*."

After the taking of the evidence before the referee, the respondent, with proper leave so to do, amended his an-

swer so that the averment in excuse of paying the items of $200 in the aggregate was the absence of the respond-ent in Europe, instead of his serious illness, as at first had been alleged. There was a motion that the referee be required to make certain findings, whereby it was alleged it would have been made to appear that the re-spondent could not give personal attention to all the matters of business in his office; that he was compelled to intrust some of the duties of the office to subordinates; that he relied upon these duties being performed by such subordinates, especially as to the receipt and payment of moneys; that during his two terms there was received and disbursed through said office sums aggregating over $2,000,000; that until January, 1898, Douglas county owed respondent over $20,000; that respondent did not know, prior to May 9, 1897, that there was in his hands any funds or penalties which had been paid to respond-ent except the Wallenz fine of $500; that when he was so informed respondent paid the amount of said fines to the county treasurer of Douglas county; that during the time that respondent was clerk of the district court aforesaid he had property and credits many times in excess of the fines and penalties alleged to have been unaccounted for by him; that, even though his bank account was over-drawn at times, his check for the amount of the public moneys remaining in his hands at the date of his election to the office of mayor of the city of Omaha would have, at any time, been honored and paid by the bank where he kept his account, and that frequently, after the coun-ty's experts began checking over the records in the office of the clerk of the district court, respondent and his deputies requested of said experts and county auditor and the county clerk an inspection of the checkings made, for the purpose of ascertaining whether such checkings showed that respondent had any public moneys in his possession, and, that respondent's demand of such checkings was denied. In the argument on the exceptions to the referee's report there are observations

that several of the findings were mere matters of evidence, and not the statement of ultimate facts deducible therefrom. We do not wish to be understood as sanctioning this criticism, but we cannot forbear the observation that the findings requested by the respondent's motion would have elicited matters purely of an evidentiary character. The report by the referee was very full, because, as was thereby disclosed, the referee was desirous to submit all the facts for the information of this court. It would have subserved no useful purpose to have recited the multifarious duties of the clerk of the district court, and his necessary dependence upon the efficiency and fidelity of his subordinates. The report of the referee disclosed facts for the existence of which the fault of deputies, or oversight on the part of their principal, was no excuse. The fines and penalties which he neglected to account for and pay over belonged to the school fund of the state, under the provisions of section 5, article 8, of our constitution, and the county was merely the custodian thereof. It would have been, therefore, no excuse for him to show, and for the referee to find, that the county was Mr. Moores' debtor with respect to other independent matters.

In section 534 of the Criminal Code it is provided as follows: "Every magistrate or clerk of court upon receiving any money on account of forfeited recognizances, fines, or costs accruing or due to the county or state, shall pay the same to the treasurer of the proper county (except as may be otherwise expressly provided) within ten days from the time of receiving the same." It would be a harsh rule which would hold a clerk liable for the mere failure to pay over fines, irrespective of oversight or other unavoidable excuse. The report of the referee, however, shows, and the evidence fully sustains it, that some of the fines therein mentioned were carried from month to month; that the Wallenz fine was not held by agreement of parties, but because of protest against paying by attorneys of parties who had no right to control payment.

Near the close of Mr. Moores' term it was shown by the evidence, and found by the referee, that the bank account of Mr. Moores was overdrawn; that in his account there had been deposited to his own individual credit the fines which he failed for a long time to pay over after the same should have been paid, and that, by his overdrafts the amounts of these fines had been appropriated to his own use. Indeed, in his testimony Mr. Moores said that if he had known that there was to his credit in the bank a certain small amount he would undoubtedly have drawn it out. There was sufficient evidence to justify the conclusion of the referee that this appropriation of public money was willful and corrupt, and this was a question of fact, with all its concomitants. It could not operate to Mr. Moores' advantage, if it had been found that he was a man of large means and credit. The only logical tendency this could have had would have been to show that Mr. Moores could have made good his default, and this consideration has doubtless lured many, if not most, defaulting officers to take risks which have ultimately proved their destruction. In a majority of cases of defalcation, it is quite likely that the first misappropriation was made in the full confidence that it would be made good and no one would be harmed. There is no middle ground either of safety or honesty. Trust funds must be held sacred, and the officer who appropriates them to his own use must be held to be guilty of a breach of trust, no matter how able and willing he may afterwards prove to be to replace the misappropriation of that which was not his own. The exceptions and objections of the respondent have been sufficiently met by these general observations, and it remains but to say that we approve the findings of the referee, and that judgment will accordingly be entered in accordance with his recommendations.

JUDGMENT OF OUSTER.

SULLIVAN, J., concurring.

While concurring in the judgment, I feel constrained to express my dissent from the proposition announced in the former opinion that the first clause of section 2 of article 14 of the constitution is directed only against those who are in default either as collectors and custodians of public money or as collectors and custodians of public property. I think the provision should be construed as though it read: "Any person who is in default as a collector or custodian of public money or property," etc. A construction based on a literal reading of the clause is not merely unreasonable, but leads to an absurdity. There never has been, and there is not the slightest reason to suppose there ever will be, in this state such an office as that of collector and custodian of public property. That the framers of the constitution or the electors of the state had such an office in mind as a possible legislative creation is beyond belief. Besides, there seems to be an insuperable difficulty in the way of one who is a collector and custodian of money ever being in default in both capacities. His relation to the money as collector necessarily ends where his connection with it as custodian begins. He cannot become a custodian without having been faithful as a collector. Thus a too literal interpretation of the clause practically nullifies it. Being charged with the duty of issuing execution for the collection of fines and judgments on forfeited recognizances, the clerk of the district court is undoubtedly a collector of public money, but his possession of such money is only incidental to its collection and he is, therefore, not a custodian within the meaning of the constitution.

NORVAL, J.

I dissent from the propositions that a respondent in quo warranto is not entitled, as a matter of right, to have the issues of fact determined by a jury, and that such

cause can properly be tried to a referee, without the consent of parties. The guaranty of the right of trial by jury is contained in both the first and last constitutions of this state in specific language. By section 6, article 1, of our present constitution, it is provided that "the right of trial by jury shall remain inviolate," and the identical language is to be found in the fifth section of the declaration of rights of the state constitution of 1866. This constitutional provision did not extend the right to a jury trial, but merely preserved or secured it in civil and criminal cases where it had before existed, or where the right was recognized by the common law. (*Sharmer v. McIntosh*, 43 Neb. 509; *Kuhl v. Pierce County*, 44 Neb. 584; *Omaha Fire Ins. Co. v. Thomson*, 50 Neb. 580; *Yager v. Exchange Nat. Bank of Hastings*, 52 Neb. 321.) In *Kuhl v. Pierce County, supra*, RAGAN, C., speaking for the court, observed: "Section 6 of the bill of rights provides that the right of trial by jury shall remain inviolate. This is a constitutional guaranty that the right of trial by jury shall remain as it did prior to the adoption of the constitution of 1875. Without going into a history of this provision, it is sufficient to say that at the time of the adoption of the present constitution the right of trial by jury was guarantied by the constitution of the state to its citizens substantially as the right existed at common law. * * * The spirit of the constitution and laws of this state seems to be this; that, if an issue of fact arise in an action equitable in its nature, such issue of fact is triable to the court; but if the issue of fact arise in a purely legal action then the issue of fact is triable to a jury." (*Vide Hagany v. Cohnen*, 29 O. St. 82; *Davis v. Morris*, 36 N. Y. 569; *Byers v. Commonwealth*, 42 Pa. St. 89; *Plimpton v. Town of Somerset*, 33 Vt. 283; *Ross v. Irving*, 14 Ill. 171.)

In *Davis v. Morris, supra*, the court of appeals of New York, in considering a provision in the constitution of that state relating to jury trials similar to our own, said: "At the time of the adoption of the constitution all cases

7

at common law were tried by jury. It follows that any party has the right to have any such action so tried at the present time, and that he cannot be deprived of this right if defendant, by the plaintiff including in his complaint a statement of fact arising out of the same transaction showing a right of recovery in equity. * * * The right founded upon the common law must be tried by jury, and it would seem to follow necessarily that the entire cause must be so tried, as no provision is made for two trials of the issues joined in the same action. It would follow that when a plaintiff moved the trial of a cause at special term, and the defendant demanded that it be tried by jury, that the judge must determine whether any of the grounds upon which a recovery was sought were such as at the adoption of the constitution were redressed solely by an action at law, and if so should direct the cause to be tried by jury at a circuit, or, at all events, should refuse to try the cause without a jury."

The writer has sufficiently familiarized himself with the history of quo warranto and the adjudications of the courts of England to be able to assert, without fear of successful contradiction, that the invariable practice at common law in informations in the nature of quo warranto and in writs of quo warranto was to try disputed issues of fact to a jury. During the fourth year of King George I. a jury was awarded upon the trial of a quo warranto proceeding in *Rex v. Bennett*, 1 Strange 101, and the same practice obtained in *Rex v. Ellis*, 2 Strange 995; *Neville v. Payne*, 1 Cro. Eliz. 304; *King v. Jones*, 8 Mod. 201. In the reign of King Charles II., *Rex v. Higgins*, 1 Vent. 366, an action of quo warranto, was tried to a jury. (*Vide Rex v. Phillips*, 1 Burr. 292; *Rex v. Malden*, 4 Burr. 2135; *King v. Mayor of London*, 1 Show. 274; *King v. Carpenter*, 2 Show. 47; *King v. Pool*, 2 Barn. 93; *King v. Bingham*, 2 East 308.) After diligent search I have been unable to find a single case in the English reports where a jury was denied to try an issue of fact in quo warranto, while a multitude of decisions are to be found in those

reports in which a jury was called in quo warranto proceedings. These considerations alone would justify the assertion that at common law a respondent in a proceeding like the present had the undoubted right to insist upon a jury trial. But we are not without an express adjudication upon the subject. In 1749 (*King v. Bridge*, 1 W. Bl. 46) it was ruled that disputed questions of fact arising in an information in the nature of quo warranto must be submitted to a jury. (*Vide King v. Duke of Richmond*, 6 Term 560; *King v. Whitchurch*, 8 Mod. 211; *King v. Harwood*, 2 East 177.)

The practice in this state, prior to the adoption of the present constitution, was, it seems, to call a jury in quo warranto. (*Kane v. People*, 4 Neb. 509.) And the same rule obtained elsewhere. (*State v. Tudor*, 5 Day [Conn.] 329; *People v. Rensselaer & S. R. Co.*, 15 Wend. [N. Y.] 113; *Tuscaloosa Scientific & Art Ass'n v. State*, 58 Ala. 54.).

In *People v. Doesburg*, 16 Mich. 133, it was decided that when an issue of fact is to be tried in quo warranto, it is not in the power of the court to deprive either party of the right to a trial by a jury against his consent.

In *State v. Allen*, 5 Kan. 213, which was a proceeding in the supreme court in quo warranto, a jury trial was awarded the defendant without deciding whether he was entitled thereto as a matter of strict right, the court saying: "At common law, in a proceeding in quo warranto, the respondent was probably entitled to a jury for the trial of questions of fact. (*People v. Doesburg*, 16 Mich. 133; Angell & Ames, Corporations 741 and notes; *State v. Messmore*, 14 Wis. 125; 3 Stephens, Nisi Prius 2429 *et seq.*; *People v. Richardson*, 4 Cow. [N. Y.] 97 and note *a*.) If the respondent at common law was in such cases entitled to a jury trial, the defendant in a civil action, in the nature of a proceeding in quo warranto, is probably still entitled to a jury trial. (Bill of Rights, Constitution sec. 5; *State v. Sheriff of Lyon County*—decided at the January term of this court, 1868, but not yet reported; *Work v. State*, 2 O. St. 296; *Greene v. Briggs*, 1 Curtis [U. S. C. C.] 311.)"

*Reynolds v. State*, 61 Ind. 392, was an information by the prosecuting attorney to test the right of the respondent to hold a public office. The defendant demanded a jury trial. The request having been overruled by the circuit court, that decision was reversed by the supreme court, that tribunal holding that either party to such a proceeding is entitled, as of right, to a trial by jury.

*State v. Messmore*, 14 Wis. 125, was an original information in the supreme court in the nature of a quo warranto, in which the attorney general demanded a jury to determine the issues of fact. His request was granted. Dixon, C. J., speaking for the court, said: "The action is an important one. Although civil in form, it is in every other respect just what it was at common law— a public prosecution. The usurpation of an office, though it involves private rights and interests, has always been regarded as a public offense. The remedy is still by action in the name of the state. It is instituted and conducted by the attorney general under his official oath and responsibility. * * * For these reasons, we think a jury should be called in this court."

While there is some conflict in the decisions in this country as to the right to have an issue of fact joined in quo warranto tried by a jury, the weight of the adjudications, as the writer conceives, confirms such right. (See Paine, Elections sec. 903; *Commonwealth v. Walter*, 83 Pa. St. 105; *Commonwealth v. Allen*, 10 Pa. St. 465; *Commonwealth v. Delaware & Henderson Land Co.*, 43 Pa. St. 295; *State v. Burnett*, 2 Ala. 140; *Buckman v. State*, 34 Fla. 48; *Van Dorn v. State*, 34 Fla. 62; *Bradford v. Territory*, 1 Okl. 366; *People v. Albany & S. R. Co.*, 57 N. Y. 161; *People v. Van Slyck*, 4 Cow. [N. Y.] 297; *People v. Havird*, 2 Ida. 498.)

Sections 280 and 281 of the Code of Civil Procedure are invoked in the majority opinion to sustain the proposition that the respondent was not entitled to a jury trial. Said sections being upon the statute book when the present constitution was adopted were modified by the

provision of the fundamental law, which guarantied to the people of this state the right of trial by jury as it existed at common law. The principle that legislative enactments may be repealed or modified by the subsequent adoption of a constitution containing a provision repugnant thereto was recognized and applied in *Moore v. State*, 53 Neb. 831.

In *Mayer v. Wilkinson*, 52 Neb. 764, it was asserted that on a trial of an issue of fact on an application for mandamus, a jury trial is not demandable as a matter of right. The writer had no part in that opinion. What is there said upon the subject was not essential to a decision of the case, since the court had already reached the conclusion that a reversal of the judgment should be entered because the trial was had at chambers in vacation.

I am firmly convinced that the constitution was violated in the present case in refusing the respondent a jury trial when he made demand therefor. Moreover, the denial of such right is in violation of rules 14-16 promulgated by this court. (52 Neb. xiv.) The first of these provides that whenever an issue of fact is presented for trial in an original action, a commission, consisting of two electors of the state appointed by the court, will select such number of persons having the qualification of jurors in the district court as may be designated in the order of appointment, and that a venire will be issued by the clerk for the persons so chosen. Rule 15 makes provision for the challenges of jurors, and rule 16 declares: "The jurors summoned or called as above provided, or such of them as are not set aside or challenged as will make up the number of twelve, shall constitute the jury for the trial of said issue of fact." This proceeding was instituted in this court, and, under the foregoing rules, the issue of fact tendered was triable to a jury.

There was no power to appoint a referee to try this cause against the objection of either party, and the order of reference was in violation of the right of trial by jury guarantied by the constitution. The writ of quo warranto

and information in the nature of quo warranto were both common-law remedies. (3 Bl. Com. 262; *Bradford v. Territory*, 1 Okl. 366; *Commonwealth v. Cullen*, 53 Am. Dec. [Pa.] 450.) This court has held by an unbroken line of decisions that under the provisions of our Code of Civil Procedure a purely legal action cannot be referred without the consent of parties, for the reason it is the right of either party in such cause to demand a trial by jury of an issue of fact. (*Mills v. Miller*, 3 Neb. 94; *Lamaster v. Scofield*, 5 Neb. 148; *Kinkaid v. Hiatt*, 24 Neb. 562; *Kuhl v. Pierce County*, 44 Neb. 584.) Numerous decisions of other courts affirm the same doctrine. (*McMartin v. Bingham*, 27 Ia. 234; *Grim v. Norris*, 19 Cal. 140; *American Saw Co. v. First Nat. Bank*, 58 N. J. L. 438; *Tunison v. Snover*, 56 N. J. L. 41; *Thayer v. McNaughton*, 117 N. Y. 111; *Untermyer v. Beinhauer*, 105 N. Y. 521; *Camp v. Ingersol*, 86 N. Y. 433; *McMaster v. Booth*, 4 How. Pr. [N. Y.] 427; *Andrus v. Home Ins. Co. of New York*, 73 Wis. 642.)

It will not be claimed that quo warranto is an equitable proceeding; and if it be true, as the majority opinion argues, that it is not a criminal proceeding, then it must be a legal remedy, and hence this court was powerless to send the cause to a referee for trial without the consent of both parties. The conclusion that I have reached makes the expression of an opinion upon the other questions considered by my associates wholly unnecessary.