STATE OF NEBRASKA, EX REL. WILLIAM J. BROATCH, V.
FRANK E. MOORES.

FILED MARCH 8, 1899.   No. 9249.

1. **Sufficiency of Petition:** WHEN ASSAILABLE. The question of the
sufficiency of a petition or information to state a cause of
action is, when the defect is substantial, open for considera-
tion throughout the proceeding, and may even be raised on a
motion for rehearing.

2. ———: CAPACITY TO SUE: WAIVER. Want of legal capacity to sue
refers to a general legal disability. If such do not exist, the
failure of a plaintiff to show a right of action in himself goes to
the sufficiency of the pleading to state a cause of action, and is
not waived by failure to demur for want of capacity.

3. **Municipal Corporations:** INELIGIBILITY OF MAYOR: SUCCESSOR. The
provisions of chapter 10, page 54, Session Laws 1897, the so-called
charter of cities of the metropolitan class, examined, and *held*
to demand that in case of ineligibility of the person receiving
the highest number of votes at the first general election for
mayor, the president of the council should exercise the office,
and not the former incumbent.

REHEARING of case reported in 56. Neb. 1. *Action dis-
missed.*

*C. C. Wright, J. B. Sheean,* and *Frank T. Ransom,* for
relator.

*John C. Wharton, Wharton & Baird, J. J. Boucher,* and
*Greene & Breckenridge, contra.*

IRVINE, C.

In this, an original action in quo warranto, opinions
have already been filed on two occasions. On the first

State v. Moores.

the court discussed the merits of a demurrer to the answer of the respondent, and it was held, by a divided court, that the information stated a cause of action and the answer a defense. (*State v. Moores*, 52 Neb. 770.) The case was then referred for a trial of the issues, and later came before the court on motions, on the one side for a judgment of ouster, and on the other to set aside the referee's report in favor of the relator. (*State v. Moores*, 56 Neb. 1.) A judgment of ouster was ordered, but subsequently a rehearing was allowed and the case has again been submitted. The former opinions disclose, with full particularity, the nature of the case and of the pleadings, but as those opinions are somewhat voluminous, it may not be amiss to restate a few general facts pertinent to the questions on which the conclusion we have now reached depends. The relator alleges that he was, prior to the act of 1897 (Session Laws, p. 54, ch. 10), which created what is called a new "charter" for metropolitan cities, the duly elected, qualified, and acting mayor of the city of Omaha; that at the first election held under the act of 1897 the respondent Moores received the highest number of votes for the office of mayor and was declared elected; that he gave the bond, took the oath, and assumed to exercise the duties of the office. There were then alleged certain facts which it was claimed rendered the respondent ineligible. Under our procedure quo warranto may be maintained either by the prosecuting attorney or by a private individual. (Code of Civil Procedure, secs. 704-728.) But if the proceeding be not instituted by the public officer, it must be by a person who himself claims the office. (*State v. Stein*, 13 Neb. 529.) Therefore, a question which we logically meet *in limine* is whether the relator has shown in himself a right to the office, assuming that the respondent was ineligible. Until the motion for a rehearing this question escaped attention by counsel, or at least it was not argued. In the opinion by NORVAL, J., on the demurrer, which voiced the views of the majority, the following language was

used: "Under and by virtue of section 11, chapter 12*a*, Compiled Statutes 1895, a person elected mayor of a city of the metropolitan class is entitled to the office during the term for which he was chosen, 'and until his successor shall be elected and qualified.' Substantially the same provision is contained in chapter 10, Laws 1897." (*State v. Moores*, 52 Neb. 770.) This point was thus cursorily assumed, as it had not then been questioned, and the language quoted was not the deliberate expression of opinion on a controverted point. On the rehearing it has been urged that the relator, as the incumbent of the office under the former charter, was not entitled to hold over under the new until the time this action was commenced. On behalf of the relator it is argued that it is now too late to raise such a question. If the question goes to the sufficiency of the information to state a cause of action, it is not too late, although regularity of practice should require an earlier presentment of the point. In appellate proceedings the sufficiency in substance of the pleadings to support the judgment forms an exception to the almost universal rule that no question will be considered which was not presented to the court of first instance. When in an original action a motion for a rehearing presents that question to this court, we should not avoid a duty, imposed upon us in appellate cases, of vacating a judgment which has no support in the pleadings on which it has been based. If the question cannot be now raised, it must be because it goes, not to the sufficiency of the information to state a cause of action, but only to the legal capacity of the plaintiff to sue. The latter defect must, when it appears on the face of the petition, be suggested by special demurrer on that ground or it will be waived. (Code of Civil Procedure, secs. 94, 96.) In *Farrell v. Cook*, 16 Neb. 483, it was held that the want of legal capacity to sue involves only a general legal disability, such as infancy, idiocy, want of authority. Therefore, when the plaintiff is a natural person under no general disability to maintain actions, a failure

to state a cause of action in his own favor goes to the
sufficiency in substance of the petition, and not to his
legal capacity. (*Willard v. Comstock*, 58 Wis. 565; *Bond
v. Armstrong*, 88 Ind. 65; *Frazer v. State*, 106 Ind. 471;
*Campbell v. Campbell*, 121 Ind. 178.) The cases cited are
all in point on principle, and we know of no authority to
the contrary. The right of the relator to maintain the
action depends upon his own right to the office; the state-
ment of that right is essential to the statement of a cause
of action; the right he claims is by virtue of having been
mayor when the old charter was repealed. This is wholly
a question of law.

The question must be determined by a construction of
section 102 of the present charter in connection with other
provisions *in pari materia.* The section referred to is as
follows: "All general elective city officers including city
councilmen, their appointees and existing boards, agents
and servants, now lawfully holding office or intrusted
with the care of public property, or affairs under the law
and ordinances heretofore in force, shall, except as in
this act otherwise provided, continue in office and the
exercise of such trust until the first general city election
herein provided for, and until the officers selected at such
election shall have duly qualified, but such officers,
agents, servants, and appointees may be removed from
office, suspended, or discharged as provided by law or
ordinance. All existing boards intrusted with property
and business under authority of laws heretofore in force
shall, at the expiration of their terms of office, except as
herein otherwise provided, turn over such property, rec-
ords, and accounts to such other officer or boards as are
herein empowered or intrusted to succeed thereto or have
possession thereof. Any officer continued in office under
the provisions of this act beyond the date when his term
would expire, under the law in force when elected or ap-
pointed, shall give additional bonds for the faithful dis-
charge of the duties of his office for such extended term,
the amount of such bond to be governed by this act or,

when not provided for herein, by ordinance. It shall be the duty of each of the respective boards and officers to prepare written detail abstracts of all tools, implements, and materials of every kind belonging to the city in their trust and care, also all work or storehouses owned or leased by the city for storage or other purposes, in duplicate, and to certify as members of such boards to the correctness thereof; such certified abstracts shall be delivered to the mayor, who shall file one of each of said copies for record with the city clerk, and the other copies shall be handed to the heads of the respective departments to be used as a basis for checking up the abstracts. *Provided*, That the provisions of this section shall not apply to the board of fire and police commissioners, but said board and the members thereof now acting shall cease to hold office upon the qualification of their successors appointed by the governor under the provisions of this act." (Compiled Statutes 1897, ch. 12*a*, sec. 102.) It is evident that the general purpose of this section was to continue in existence the essential governmental machinery of the city until officers could be selected and installed under the new act. This act with an emergency clause repealed the former charter, so that without this section the city of Omaha would have been without a municipal government from the time the new act was passed until the organization thereunder several weeks later. The object of the section was to bridge over this period. Some duties which the former act imposed on certain officers or boards were by the new imposed upon other officers, so that section 102 in general terms provided that those exercising duties under the old should continue to exercise those duties under the new until the officers upon whom the new charter imposed similar duties were elected and qualified. Upon the perfection of the new organization section 102 would have performed its functions and become obsolete.

By section 13 a special provision was made for an election of officers on a day as near as practicable to that

23

when the act took effect, and on a date other than that provided for subsequent elections. This and many other provisions throughout the act plainly disclose a legislative intent to as soon as possible supersede the former city government and the former officers, and to as promptly entirely replace them by the new organization. So far, however, as section 102 contemplated keeping in office the existing city officers until after the first election and the qualification of the new officers, its scheme was general only, not universal. By the express terms of the section it did not apply to fire and police commissioners who were to retire upon the appointment of their successors, and by section 167 the governor was required to appoint their successors immediately on the taking effect of the act—another indication that it was desired to continue existing officers only so long as might be necessary to prevent municipal anarchy. Moreover, the section provides that in its general scope it shall apply only to cases not "in this act otherwise provided;" that is, it was to apply only as a last resort in cases where without such provision there would be no provision for government.

This language directs attention at once to the rest of the act, to ascertain whether the contingency before us was otherwise provided against. Section 75 is as follows: "When any vacancy shall happen in the office of mayor by death, resignation, absence from the city, removal from office, refusal to qualify, or otherwise, the president of the council for the time being shall exercise the office of mayor with all the rights, privileges, powers, and jurisdiction of the regular mayor until such vacancy be filled or such disability removed, or in case of temporary absence, until the mayor shall return," etc. This seems at once to indicate a special provision as to the office of mayor, which should apply to the present case should the respondent be found ineligible. If not, then it must be either because ineligibility does not give rise to a "vacancy" in the sense in which the word is here used, or else because the general term "otherwise" is not broad

enough to cover a vacancy by that reason. The section is perhaps open to the construction that it refers only to the contingency of there being no one, such as an officer holding over, who could take the office. Such a construction might reasonably be placed on section 184, relating to vacancies in the office of police judge "by death, resignation, or otherwise." The word "otherwise," in connection with the special words there employed, should probably be restricted to other cases of similar character, and the special terms refer only to causes which end prematurely the term of an actual incumbent. But section 75 contains other special words. "Refusal to qualify" immediately precedes the general word "otherwise." A refusal to qualify by an elected officer therefore created a "vacancy" within the meaning of the section, and thus the meaning is extended to cases where the person who should otherwise take the office fails for some reason to do so, although to that time it has been occupied by another who might, if empowered to hold over, prevent a technical vacancy. That the term must have that effect is certain, unless we regard the refusal to qualify as relating only to the case of one already in office who refuses to requalify after a re-election or in order to hold over. If the legislature had intended such a marked and unusual restriction of the term it would certainly have used other and more restricted language. We would do violence to the language of the act should we read into it such a restriction. If, then, a refusal of an officer elected to qualify, and thus to assume the office in the first instance, creates a vacancy as the word is here used, a failure to qualify by reason of ineligibility must necessarily fall within the general term "otherwise." It creates a vacancy of entirely similar character. The majority opinion in *State v. Boyd*, 31 Neb. 682, seems at first to indicate a different construction, but on examination it is not opposed to our present conclusion. The language there construed was different. It was indeed held there that ineligibility did not amount to a "refusal to qualify,"

and we so hold. We now hold merely that a vacancy from either cause is of a character so similar to one caused by the other that a broad, general, inclusive term following one of the special reasons will include the other. In the *Boyd Case* the general term was "other disability," and the decision turned upon the force of the word "disability." The decision might there have been different if the general term had been "other reason" or "otherwise." "Disabilities," in their technical sense, were in the provision there considered specially mentioned, and the court restricted the general term to other disabilities of the classes specially mentioned.

When we observe the full and general force of the exception to section 102, which makes it applicable only where no other provision can apply, the existence of section 75, referring specially to the office of mayor and making a different provision, the unusually broad special and general terms of the latter section, and on perhaps broader and more potent grounds give effect to the manifest general purpose to end the old regime as speedily as possible and supplant it with the new, we cannot escape the conclusion that after the first city election and the time when the mayor who should be then chosen should have qualified, it was the intention that if the election should fail, or the person elected fail to qualify, then the president of the council should exercise the office. The former mayor, chosen under the repealed charter, was not expected to in that event continue in office.

DISMISSED.

NORVAL, J.

I agree to the entry of a judgment dismissing the proceeding.

SULLIVAN, J., dissenting.

It seems to me the decision of the court is the result of a strange perversion of the statutory provisions quoted

in the opinion.  The argument which leads to the con-
clusion reached was not advanced by any of the learned
counsel for respondent, and they will, doubtless, be
amazed and much chagrined to learn that their client
has at last succeeded in the action without effective aid
from them.  The assumption that section 102 was in-
tended to apply only to exceptional cases and "as a last
resort" is manifestly unwarranted.  The language is
sweeping, and plainly includes all the elective and ap-
pointive officers, agents, and servants holding office or in-
trusted with the care of public property or affairs under
any general law or ordinance of the city, excepting those
concerning whom some special provision had been made
in the act.  All persons lawfully holding public places
under the charter of 1887 were to continue to exercise
their functions under the act of 1897 until the election
and qualification of their respective successors, except
in cases where the new "act otherwise provided."  The
new act did otherwise provide for the board of fire and
police commissioners.  It did otherwise provide in section
17, which immediately conferred upon the mayor and
council the power to remove certain officers of the city
for cause, and to fill the vacancies thereby created.  It
did otherwise provide in section 103, which authorized
the district court to remove any officer convicted of mal-
feasance or misfeasance, and provided that such officer,
pending the proceedings against him, might be deprived
of the right to exercise his trust.  In these particular in-
stances, and perhaps in others, the first sentence of sec-
tion 102 was, for obvious reasons, made inapplicable.
The office of the clause, "except as in this act otherwise
provided," was to make the act congruous—to give its
parts harmonious relation—and to prevent the claim be-
ing set up that every one who held an office or exercised
a trust under the old law should possess an absolute and
unqualified right, by virtue of the special provision, to
continue in office and in the exercise of such trust until
relieved by a qualified successor chosen under the author-

ity of the new charter.  It is known, of course, to those
familiar with the recent political history of the state that
back of the provisions concerning the police and fire com-
missioners was a distinct legislative purpose to precip-
itately end the official existence of the members of the
old board; but neither in the act nor out of it is there
anything whatever to warrant the assertion that the leg-
islature contemplated unseemly or unusual haste in dis-
posing of public servants who held their places directly
or derivatively from the local electorate.  Section 75 was
certainly not adopted as part of a general scheme to ac-
celerate the displacement of officers who were to hold
temporarily under the saving clause of the substituted
charter.  It was a permanent provision, and intended to
be effective so long as the law should remain in force.
It is familiar doctrine that in the absence of a clear legis-
lative intention to precisely limit the tenure of an office
so that at a particular time the authority of the incum-
bent shall cease, such incumbent is entitled to exercise
his official functions until another person is qualified to
assume them.  In McCrary, Elections [3d ed.], section
314, it is said that both reason and authority support
the proposition that there is an implied right to hold over,
unless the contrary appears to be the plain requirement
of the statute.  Section 104 of chapter 26, Compiled Stat-
utes 1897, provides: "Every officer elected or appointed
for a fixed term shall hold office until his successor is
elected, or appointed and qualified, unless the statute
under which he is elected or appointed expressly declares
to the contrary."  Where is there an express declaration,
or even reasonable implication, that the mayor of Omaha
shall not hold his office and exercise its functions until
a duly chosen and qualified successor is ready to take his
place?  Attention is directed in the majority opinion to
section 75, where it is said that "when any vacancy shall
happen in the office of mayor by death, resignation, ab-
sence from the city, removal from office, refusal to qual-
ify, or otherwise, the president of the council" shall fill

such vacancy. It is then argued that, since a refusal to qualify by one who has been elected and is eligible creates a vacancy, a failure to qualify, by one who has received a plurality of votes, but who has not been elected because of ineligibility, must also create a vacancy and be comprehended within the meaning of the word "otherwise." Undoubtedly the legislature may, when not restrained by the constitution, declare what circumstance shall constitute a vacancy in office, but I have always understood that, in the absence of an express statute, a vacancy does not exist where there is a person lawfully in possession of the office competent to exercise its functions and invested with authority so to do. (Meachem, Public Officers sec. 126; *People v. Van Horne*, 18 Wend. [N. Y.] 515; *State v. Howe*, 25 O. St. 588; *State v. Harrison*, 113 Ind. 434; *People v. Tyrrell*, 87 Cal. 475.) In *Commonwealth v. Hanley*, 9 Pa. St. 513, it was held that where an officer elect dies before qualifying, his death does not create a vacancy. And in section 330 [3d ed.] of McCrary, Elections, it is said: "There are authorities of great weight holding that the power to fill a vacancy occurring in an office cannot be exercised until the office has once been filled during the term thereof; and that therefore no such power exists in a case where there has merely been a failure to elect within the time required by law." In the *Boyd Case* it was held that the election of an ineligible candidate to the office of governor was void, but that the failure of the election did not create a vacancy. It was also held in *Richards v. McMillan*, 36 Neb. 352, that the failure to elect a person qualified to hold the office of county treasurer did not create a vacancy within the meaning of section 101 of the general election law. In the first point of the syllabus it is said: "A county board is not authorized to declare vacant a county office and make an appointment to fill such vacancy on the sole ground that an officer elect is ineligible and therefore unable to qualify. The incumbent of such office has a right to qualify within ten days after it is

ascertained that his successor elect is ineligible, and upon qualifying in the manner provided by law will be entitled to hold over until a successor is elected and qualified." The section of the statute defining vacancies specifies nine events, upon the happening of any one of which a public office shall become vacant. Five of these are enumerated in section 75, and the other four are presumably included in the word "otherwise." A mere failure to elect does not of itself create a vacancy. The statute so states and this court has so decided. The decision on the demurrer was right. The judgment of ouster was in accordance with the law and the facts and should be adhered to. This important litigation, after its eventful career, should not end in a dog-fall.