S. C. WHEELER v. WILLIAM W. CALDWELL.

No. 13,777. (74 Pac. 1031.)

SYLLABUS BY THE COURT.

1. QUO WARRANTO—*Jury Trial Not Demandable.* A jury trial is
not demandable as a matter of right in a proceeding in *quo war-
ranto.*

2. ELECTIONS— *Challenged Voters—Identification of Ballots
Sufficient.* At an election precinct only four of the voters were
challenged, and the ballots they cast were marked so as to indicate
that they were cast by challenged voters. The ballots so identified
showed that all had been cast for a certain candidate. *Held,*
that the identification is sufficient, and that the proof of identity
of the ballots and for whom they were cast is not overcome by a
showing that one of the challenged voters was accompanied to the
polls by a friend of another candidate, nor by the fact that his
vote was challenged by a friend of the candidate whose name was
on the challenged ballots.

3. ———— *Ballots—Irregularities Insufficient to Require Rejec-
tion.* A ballot, legal in form, cannot be rejected merely because
there is one more ballot in the ballot-box than there are names
written on the poll-books, and also that it happened to be the
last ballot taken from the box when the ballots were counted and,
under the facts in this case, it is *held,* that the ballot to which
such objections were made should have been counted.

4. ———— *Illegal Ballot—Improper Marking.* Where one of
the lines of a cross on a ballot is paralleled by a third distinct line,
it should be regarded as a distinguishing mark, and the ballot
treated as illegal.

5. ———— *Ballot Not Illegal Because of Unequal Length of*

*Cross-marks.* The mere fact that one of the lines of a cross-mark on a ballot is shorter than the other one does not warrant the rejection of the ballot, where the shorter line actually crosses the longer one.

6. PRACTICE, SUPREME COURT— *Cross-petition in Error* — *Motion for New Trial.* A cross-petition in error is treated as an independent proceeding, and the party complaining must take the preliminary steps giving him a right to assign error, and before errors occurring during the trial can be made the basis of a review, they must be presented to the trial court for reconsideration on a motion for a new trial.

Error from Cloud district court ; HUGH ALEXANDER, judge.   Opinion filed March 12, 1904.   Reversed.

*A. L. Wilmoth, F. W. Sturges,* and *Garver & Larimer,* for plaintiff in error.

*Theodore Laing, E. V. D. Brown, Dwight M. Smith, Isaac M. Rigby,* and *Park B. Pulsifer,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J. : The title to the office of mayor of the city of Concordia is involved in this proceeding. An election was held on April 7, 1903, when William W. Caldwell and S. C. Wheeler were candidates for mayor, and the result, as found by the canvassing board, was that Wheeler received 809 votes, while Caldwell received 808 votes.   A certificate of election was issued to Wheeler, and on April 12 he qualified and entered upon the discharge of the duties of the office.   Caldwell brought this proceeding, alleging that he had received the greater number of legal votes and was entitled to the possession of the office. Upon a trial, the district court found that 1597 legal ballots had been cast by qualified voters for mayor, of which Caldwell received 799 and Wheeler 798, and therefore gave judgment in favor of Caldwell.

A jury was demanded by Wheeler to try the facts, but the court refused the demand, and of this ruling complaint is made. Whether a jury is demandable as a matter of right in a case of *quo warranto* is still an open question in this state. In several cases the question has been suggested and left unanswered, but in some of them a jury was granted *ex gratia*. (*The State, ex rel., v. Allen*, 5 Kan. 213; *The State, ex rel., v. Foster*, 32 id. 14, 3 Pac. 534.) In this state there has been substituted for the writ of *quo warranto* and the information in the nature of *quo warranto* a civil action, and under this act the remedies formerly obtainable in *quo warranto* may be had. (Civil Code, § 652; Gen. Stat. 1901, § 5148.) So far as our code is concerned, it provides that a party is entitled to a jury to try issues of fact in civil actions brought for the recovery of money or of specific real or personal property, and that all other issues of fact shall be tried by the court, unless it chooses to submit them to a jury or referee. (Civil Code, §§ 266, 267; Gen. Stat. 1901, §§ 4713, 4714.)

It is contended, however, that at common law a party was entitled to a jury trial in *quo warranto* proceedings, and that the common-law right was preserved and continued by virtue of section 5 of the bill of rights, which provides that "the right of trial by jury shall be inviolate." This provision means that the right of trial by jury shall be and remain as ample and complete as it was at the time when the constitution was adopted. (*The State, ex rel., v. City of Topeka*, 30 Kan. 653, 2 Pac. 587.) What, then, was the status of the law as to the right to a jury in *quo warranto* cases at that time? If the common-law rule is to control, the question arises as to what common-law rule was in effect in this respect when the constitution was

1. Jury trial in quo warranto proceeding.

adopted. The first act adopting the common law as a rule of action in Kansas was passed by the first legislature held in Kansas, and so much of it as is pertinent reads as follows :

" SECTION 1. The common law of England and all statutes and acts of parliament made prior to the fourth year of James the First, and which are of a general nature, not local to that kingdom, and not repugnant to, or inconsistent with, the constitution of the United States, and the act entitled 'An act to organize the territory of Nebraska and Kansas,' or any statute law which may from time to time be made or passed by this or any subsequent legislative assembly of the territory of Kansas, shall be the rule of action and decision in this territory; any law, custom or usage to the contrary notwithstanding." (Ch. 96, Territorial Statutes 1855.)

This act was repealed, and then reenacted in substantially the same language, in 1859. (Laws 1859, ch. 121, § 1.) According to these acts of adoption, the common law as it existed in England in the fourth year of James the First, which was 1607, became the common law of Kansas, and remained such at least until the state constitution was adopted. (*Kansas Pacific Rly. Co. v. Nichols, Kennedy & Co.*, 9 Kan. 235, 12 Am. Rep. 494.) At the date fixed in the act of adoption, the common law did not award a jury trial as a matter of right in *quo warranto* proceedings, nor was such right given until the passage of the act of parliament in 1730, known as 3 Geo. II, ch. 25. In *Taliaferro v. Lee*, 97 Ala. 92, 13 South. 125, the supreme court of Alabama had under consideration the right to a jury in a *quo warranto* proceeding, and it was said :

"At no period in the history of the information in England, so far as we are aware, was the relator or respondent ever regarded as entitled to trial by jury

Wheeler v. Caldwell.

until that right was expressly conferred by act of parliament. (3 Geo. II, ch. 25.)''

See, also, *State v. Johnson*, 26 Ark. 281 ; *State, ex rel. Att'y Gen., v. Vail*, 53 Mo. 97 ; *State, ex rel. Norton, v. Lupton*, 64 id. 415, 27 Am. Rep. 253 ; *State, ex rel. Mullen, v. Doherty*, 16 Wash. 382, 47 Pac. 958, 58 Am. St. Rep. 39 ; *State v. Moores*, 56 Neb. 1, 76 N. W. 530.

Then, again, the statutory law, as it existed when the constitution was adopted, did not give the suitor a right to trial by jury in cases of this kind. Even if the common law had accorded this right, it was competent for the legislature to modify it and to make such cases triable by the court. In 1859 the legislature passed an act specifically providing what cases and issues should be tried by a jury and what should be triable by the court. (Laws 1859, ch. 25, §§ 274, 275.) Whether the question is determinable by the common law as adopted in Kansas, or by the statute as it existed when the constitution was framed, a jury cannot be required, as a matter of right, in this proceeding. If the rule of the present code is applied the same result will be obtained, and hence we conclude that no error was committed in denying the application for a jury.

The controversy as to the result of the election arose over qualifications of persons who voted, ballots in excess of the number shown by the poll-books, ballots on which it was claimed there were identifying marks, and ballots imperfectly marked by the voters. The qualifications of several of those who voted for Wheeler were challenged by Caldwell. One of them, Bagwell, made a trip to Iowa, and, though he soon returned to Concordia, there was testimony tending to show that he went to Iowa with the intention of establishing a resi-

2. Identification of ballots of challenged voters.

dence there. Another was McCullough, who had been living with his mother in Concordia, but who, it was claimed, had changed his residence to the neighboring town of Clyde, and was therefore not entitled to vote. Another was Mrs. Webb, who, it was claimed, lost her right to vote by moving from one ward of the city to another; and still another was Cora Garder, who, it was claimed, was not a resident of Concordia at the time of the election. All of these had voted for Wheeler, and the court held them to be disqualified, and consequently took four votes from the count for Wheeler. The testimony as to the residence of these persons is not satisfactory, but it cannot be said that there is no testimony to sustain the findings of the trial court.

Looking at the testimony as it is brought to us in the record, we strongly incline to the opinion that McCullough and Garder were legal voters, and that their votes should have been counted, but we are aware that the trial court had superior opportunities to measure the testimony, and since it cannot be said that its findings are without support, we are bound by them.

One Creaghor, who voted in the third ward, was found not to be a qualified voter, and the court concluded that he had voted for Wheeler, and deducted a vote from the number credited to Wheeler. This was error, as the testimony shows that Creaghor voted for Caldwell, and if not qualified, the vote should have been taken from Caldwell instead of Wheeler. When his vote was challenged, he was sworn to answer as to his qualifications, after which his ballot was received. The word "sworn" was written on the ballot, and the number opposite to his name on the poll-book should have corresponded with the number on the ballot.

There was no such conformity, and because of this discrepancy it was impossible, from the numbers alone, to identify the ballot cast by Creaghor. It was otherwise identified. It appeared beyond dispute that his was a challenged vote; that his ballot was so marked; that there were only four challenged votes cast in the ward, and that each one of them showed on its face that it was in favor of Caldwell. Under this showing, mainly record proof, there is no escape from the conclusion that Creaghor voted for Caldwell. The lack of agreement between the numbers on the poll-book and the ballot is accounted for on the theory that the ballot was given to him and numbered by the election officers when he approached the polls, instead of after the challenge. Then he was challenged, and some time was occupied by the challenge and the swearing in of his vote. In the intervening time others approached and voted, and one of their names was written on the poll-books opposite the number placed on Creaghor's ballot. In that case the number on the ballot was the number reached when the ballot was handed to him, while the number opposite his name on the poll-book was the number reached when the challenge had been decided and the ballot received. The four challenged votes, one of which was cast by Creaghor, were sufficiently identified; the ballots themselves were indubitable proof that all of them were for Caldwell; and such proof is not overcome or affected by the mere circumstances that Creaghor was accompanied to the polls by a friend of Wheeler and was challenged by a friend of Caldwell. The illegal vote should have been taken from the Caldwell count, and not from that of Wheeler.

In the second ward a ballot which was marked 309 and was cast for Wheeler was rejected by the court.

Wheeler v. Caldwell.

This was done because of the claim that there was one more ballot in the box than there were voters, as shown by the poll-books. The court found that 312 ballots had been put into the box, while the poll-books showed that only 311 persons had voted. It appears that 309 of the ballots had been strung upon a wire, and that three blank and defective ballots had been returned in an envelope. The court decided that there was an excess ballot in the box that should not have been counted ; that one must be rejected ; that it must be one of the good ballots, and that it must be the last one taken from the ballot box. The one on the wire farthest from the needle was treated as the first ballot taken out, and the one nearest the needle as the last one taken from the box. That proved to be ballot 309, which had been cast for Wheeler, and it was rejected and deducted from Wheeler's vote. This was error.

*3. Irregularities insufficient to require rejection of ballot.*

Nothing in the statute, nor in reason, warranted the rejection of the last ballot that the election officers chanced to take from the box. Besides, the testimony to which we are referred does not warrant the conclusion that ballot numbered 309 was the last one taken from the box. Here, then, was a properly marked ballot which was apparently legal in every respect, and in the absence of a statute declaring such a rule of eliminating an excess ballot, or of proof that it was illegal, we know of no reason for disfranchising the one who cast it, or for deducting it from the count of the candidate for whom it was cast. In the absence of proof, there is as much reason to assume that the clerks erred in registering the names of voters as that an extra ballot was wrongfully thrust into the box, and there appears to have been some discussion among

the officers as to whether the names were correctly enrolled. It appears that one of the three ballots returned in the envelope was blank; that it had never been numbered, and that the corner had never been clipped from it. The judge in charge of the numbering said that no ballot was given out to voters that was not numbered, and there is reason to think that this blank ballot, which had not been numbered, marked, or clipped, had never, in fact, been voted. If voted, two of the judges must have failed in the performance of their duties, the one who numbered and the one who clipped the ballots; but this cannot be presumed. So it is claimed that the blank ballot was probably picked up from the table and accidentally placed in the envelope which was returned. But whether accounted for in that way or not, there was nothing in the circumstances of the case, nor in the testimony, which justified the court in discarding ballot numbered 309, or in deducting that vote from the count for Wheeler.

The legality of a large number of defectively marked ballots was challenged. In the counting of such ballots, the court adopted what may be called a very liberal rule. It said :

4. Improper marking of ballot.

"Upon the trial, when the various numbered votes (those numbered by the stenographer) were taken from the wires and examined, many of them for the plaintiff, Caldwell, had crosses in the proper places, but the crosses were not always made with two single lines, and in many instances there would be one or more additional lines, but they appeared to be so made simply for a desire on the voter's part and in the effort on his part to make a cross with lines so distinct and plain that his vote should not be overlooked from lack of plainness ; and in many instances one or more arms of the cross would extend somewhat over the circle — that is, outside, or outside the squares, whichever form

of voting was used, and this was apparently due either to haste or carelessness on the part of the voter; in some instances the marks were ill made, due to nervousness, or to the fact that the hand making them trembled with age or was unused to a pencil. What has been said in this finding with reference to ballots voted for Caldwell is equally true as to many ballots voted for Wheeler, and the number of ballots so marked was probably about equal in number and in the character of their markings on both sides, and the court in counting such ballots has intended to and did count for the person for whom they were marked all such as showed the intention of the voter and were marked with a cross mark in the proper place, and the marks were not such as to be in character a distinguishing mark, and where they were clearly not made by the voter with an evident purpose to identify his ballot."

Of this rule, in the abstract, there is no good reason for complaint; but we are unable to agree with the court in its application. For instance, there was a ballot numbered 100, cast in the fourth ward and counted for Caldwell, on which there was a cross in the circle composed of three lines. One of the arms of the cross was substantially paralleled by a third distinct line. There is nothing to indicate that the extra line was an attempt to retrace an indistinct line, or that it was made by one who was nervous or unused to a pencil. The departure from the prescribed form is patent, easily described, and it would be difficult to invent a better distinguishing mark. There was a like defect on ballot numbered 344, cast for Caldwell in the fourth ward, where parallel lines were used in making the cross. Neither of these ballots should have been counted.

Wheeler complains that ballots numbered 4 and 359, which were cast for him and thrown out by the court, should have been counted in his favor. On each bal-

lot one of the arms of the cross was constituted of two

**5. Marking a ballot.**

distinct parallel lines, and because they were easily described and distinguishable they were illegal and properly excluded by the court.

Wheeler has good reason to complain of the exclusion of ballot numbered 427, cast for him in the fourth ward. It was excluded because the marks opposite the names of Bowman and Blair, who were candidates on the same ticket with Wheeler, were not proper crossmarks. One of the lines of each of the cross-marks was shorter than the other, and the court stated that the mark was the shape of an inverted Y. The shorter line, however, actually crossed the longer one, and, the ballot being otherwise unobjectionable, we think it was legal and should have been counted.

Other rulings adverse to Wheeler are complained of, but the conclusions we have already reached settles it that Wheeler had a clear majority over Caldwell for the office in contest, and a further consideration of Wheeler's claims of error is unnecessary.

A cross-petition in error has been filed by Caldwell, in which he complains of rulings made by the court against his contentions. He did not file a motion for a new trial, and thus give the trial court an opportunity to review, and if necessary correct, its rulings. The motion filed by Wheeler, complaining of rulings against himself, affords Caldwell no basis to obtain a reconsideration of rulings favorable to Wheeler. A

**6. Cross-petition in error an independent proceeding.**

cross-petition in error is treated as an independent proceeding, and the party complaining must take the preliminary steps which give him a right to assign error. Errors occurring during the trial cannot be made the basis of a review unless they have been presented to the court for reconsideration on a motion for a new trial. (*Cog-*

Assaria v. Wells.

*shall v. Spurry*, 47 Kan. 448, 28 Pac. 154.   See, also, *Fowler v. Krutz*, 54 id. 622, 38 Pac. 808.)

The case of *McPherson v. The State ex rel.*, 56 Kan. 139, 42 Pac. 374, is a sufficient answer to the contention that this court is without jurisdiction to review the rulings in this proceeding.

It follows from what has been said that the judgment of the district court will be reversed, and the cause remanded, with directions to enter judgment in favor of plaintiff in error.

All the Justices concurring.