SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| JUSTIN DERENDAL, | ) Arizona Supreme Court |
| | ) No. CV-04-0037-PR |
| Petitioner-Appellant, | ) |
| | ) Court of Appeals |
| v. | ) Division One |
| | ) No. 1 CA-CV 03-0380 |
| HON. DEBORAH GRIFFITH, JUDGE OF | ) |
| THE PHOENIX CITY COURT, | ) Maricopa County Superior |
| | ) Court |
| Respondent Judge, | ) No. CV LC 03-000001-001DT |
| | ) |
| PHOENIX CITY PROSECUTOR'S OFFICE, | ) |
| | ) |
| Real Party in Interest- | ) **O P I N I O N** |
| Appellee. | ) |
| _____ | ) |

Order from Phoenix Municipal Court
No. 2760118
The Honorable Deborah Griffith
**AFFIRMED**

_____

Appeal from the Superior Court of Maricopa County
No. CV LC 03-000001-001DT
The Honorable Michael D. Jones
**AFFIRMED**

_____

Opinion of the Court of Appeals, Division One
No. 1 CA-CV-03-0380
**VACATED**

_____

LAW OFFICES OF NEAL W. BASSETT                                    Phoenix
     By   Neal W. Bassett
     And  Natalee Segal
And
LAURIE A. HERMAN, Attorney at Law                                Scottsdale
     By   Laurie A. Herman
Attorneys for Justin Derendal

PETER VAN HAREN, Phoenix City Attorney                    Phoenix
     By   William C. Solomon, Assistant City Prosecutor
     And  Samuel K. Lesley, Assistant City Prosecutor
Attorneys for Phoenix City Prosecutor's Office


JAMES J. HAAS, Maricopa County Public Defender      Phoenix
     By   Kathleen N. Carey, Deputy Public Defender
Attorneys for Amicus Curiae
Maricopa County Public Defender


STEPHEN PAUL BARNARD                                       Tucson
Attorney for Amicus Curiae
Arizona Attorneys for Criminal Justice


MICHAEL G. RANKIN, Tucson City Attorney                   Tucson
     By   Laura R. Brynwood
          Principal Assistant City Attorney - Deputy
     And  William F. Mills, Supervising Prosecutor
          Criminal Division
Attorneys for Amicus Curiae City of Tucson


JOSEPH R. BERTOLDO, Scottsdale City Attorney       Scottsdale
     By   Kenneth M. Flint
          Assistant City Prosecutor
Attorneys for Amicus Curiae City of Scottsdale


TOBIN C. SIDLES, Town Prosecutor
          Town of Oro Valley                       Oro Valley
     And Dillon Fishman, Rule 38(e) Law Student
          University of Arizona, College of Law
Attorneys for Amicus Curiae Town of Oro Valley


DEBORAH J. SPINNER, Mesa City Attorney                      Mesa
     By   Roger Kevin Hays
          Chief Assistant City Prosecutor
     And  Stephen Mercer, Assistant City Prosecutor
Attorneys for Amicus Curiae City of Mesa


LAW OFFICE OF TREASURE VANDREUMEL                        Phoenix
     By   Treasure VanDreumel
And
GARY KULA, City of Phoenix Public Defender              Phoenix
Contract Office
Attorneys for Amicus Curiae City of Phoenix Public Defender
_____

M c G R E G O R, Vice Chief Justice

¶1      We granted review to consider whether Arizona should retain the test set out in *Rothweiler v. Superior Court*, 100 Ariz. 37, 410 P.2d 479 (1966), to determine when the Arizona Constitution mandates that a criminal offense be eligible for trial by jury.

## I.

¶2      Justin Derendal was charged in Phoenix Municipal Court with drag racing,[1] a class one misdemeanor, Ariz. Rev. Stat. (A.R.S.) § 28-708.B (2001), punishable by a maximum of six months incarceration, *see* A.R.S. § 13-707.A.1 (2001), and a $2,500 fine, *see* A.R.S. § 13-802.A (2001).  The municipal court denied Derendal's request for a jury trial, and Derendal filed a special action in superior court.  The superior court accepted jurisdiction but denied relief, and Derendal appealed to the court of appeals.

¶3      The court of appeals applied the three-part test established by this court in *Rothweiler* and, concluding that drag racing failed to meet any of the three tests for jury

_____

[1]      "A person shall not drive a vehicle or participate in any manner in a race, speed competition or contest, drag race or acceleration contest, test of physical endurance or exhibition of speed or acceleration or for the purpose of making a speed record on a street or highway."  Ariz. Rev. Stat. (A.R.S.) § 28-708.A (2001).

eligibility set out in *Rothweiler*, affirmed the superior court's judgment.

**¶4**     We granted Derendal's petition for review and ordered the parties to file supplemental briefs addressing whether the *Rothweiler* test should remain the test for determining jury trial eligibility in Arizona. We exercise jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II.

**¶5**     In 1966, this court adopted a three-pronged test to decide whether, with regard to a particular criminal offense, the federal or Arizona Constitution guarantees the right to a jury trial. Relying on both federal and Arizona constitutional law, we defined three factors as relevant to that inquiry: (1) the relationship of the offense to common law crimes; (2) the severity of the statutory penalties that apply; and (3) the moral quality of the act. *Rothweiler*, 100 Ariz. at 42, 410 P.2d at 483. Over time, Arizona courts have come to view these factors as three independent prongs in the constitutional analysis of the right to jury trial. *See, e.g.*, *State v. Harrison*, 164 Ariz. 316, 317, 792 P.2d 779, 780 (App. 1990) ("Each prong [of the *Rothweiler* test] is independently sufficient to give rise to a jury trial.").

4

¶6        Twenty-three years after our *Rothweiler* decision, the United States Supreme Court held that any criminal offense for which the maximum statutory penalty is less than six months incarceration is presumptively a petty offense to which the right of trial by jury guaranteed by the Sixth Amendment to the United States Constitution does not attach.  *Blanton v. City of North Las Vegas*, 489 U.S. 538, 543 (1989).  On several occasions, this court has rejected invitations to replace the *Rothweiler* test with the *Blanton* test, reasoning that the Arizona Constitution requires greater protection of the right to trial by jury than does the federal constitution.  *See, e.g., Benitez v. Dunevant*, 198 Ariz. 90, 94 ¶ 10, 7 P.3d 99, 103 (2000); *State ex rel. McDougall v. Strohson*, 190 Ariz. 120, 126-27, 945 P.2d 1251, 1257-58 (1997); *cf. State ex rel. Dean v. Dolny*, 161 Ariz. 297, 299, 778 P.2d 1193, 1195 (1989).  We have never expressly considered whether we should adopt a modified version of *Blanton*.  We do so today.

¶7        Two separate provisions of the Arizona Constitution secure the right to jury trial for certain criminal defendants. The first, Article 2, Section 23, provides that "[t]he right of trial by jury shall remain inviolate."  The second, Article 2, Section 24, further provides that "[i]n criminal prosecutions, the accused shall have the right to . . . a speedy public trial

5

by an impartial jury of the county in which the offense is alleged to have been committed . . . ."

¶8     We have established several principles that govern the interpretation of these constitutional provisions.  We have long interpreted them as preserving, rather than creating, the right to jury trial as it existed in Arizona prior to statehood. *Bowden v. Nugent*, 26 Ariz. 485, 488, 226 P. 549, 549-50 (1924); *Brown v. Greer*, 16 Ariz. 215, 217, 141 P. 841, 842 (1914).  In addition, it is well settled that under the common law at the time of Arizona's statehood, only those accused of "serious offenses" had a right to trial by jury.  *See, e.g., Goldman v. Kautz,* 111 Ariz. 431, 432, 531 P.2d 1138, 1139 (1975); *Rothweiler,* 100 Ariz. at 42, 410 P.2d at 482; *Bowden*, 26 Ariz. at 491, 226 P. at 551.  Thus, Article 2, Sections 23 and 24 do not independently grant a right to jury trial to all criminal defendants; rather, they preserve the right to jury trial for those accused of serious offenses.  *Benitez*, 198 Ariz. at 93 ¶ 4, 7 P.3d at 102; *Dolny*, 161 Ariz. at 299, 778 P.2d at 1195.  As a result, the "test for jury eligibility in this state requires an inquiry into the seriousness of the offense."  *Benitez*, 198 Ariz. at 92 ¶ 4, 7 P.3d at 101.

**A.**

¶9     The language of Article 2, Section 23 mandates that we retain the *Rothweiler* test's first prong: the relationship of

6

the offense to common law crimes. We have consistently held that the phrase "shall remain inviolate" preserves the right to jury trial as it existed at the time Arizona adopted its constitution. *Benitez*, 198 Ariz. at 93 ¶ 4, 7 P.3d at 102; *Bowden*, 26 Ariz. at 488, 226 P. at 550.[2] Thus, our constitution requires that the state guarantee a right to jury trial for any defendant charged with an offense for which a jury trial was granted prior to statehood.

¶10 We have further held that when the right to jury trial for an offense existed prior to statehood, it cannot be denied for modern statutory offenses of the same "character or grade." *Bowden*, 26 Ariz. at 491, 226 P. at 551. Because the Arizona legislature abolished all common law crimes more than thirty years ago, *see* A.R.S. § 13-103.A (1978), many newly minted statutory criminal offenses have no precise analog in the common law.[3] To determine whether Article 2, Section 23 assures the

_____

[2] This has been the almost universal interpretation of the phrase "shall remain inviolate" in those jurisdictions whose constitutions contain equivalent language. *See, e.g.*, *Wheeler v. Caldwell,* 75 P. 1031 (Kan. 1904); *State ex rel. Jackson v. Kennie*, 60 P. 589 (Mont. 1900); *Kuhl v. Pierce County*, 62 N.W. 1066 (Neb. 1895); *State v. McClear*, 11 Nev. 39 (1876); *Vaughn v. Scade*, 30 Mo. 600 (1860); *Work v. State*, 2 Ohio St. 297 (1853); *Ross v. Irving*, 14 Ill. 171 (1852).

[3] We acknowledge, as the State asserts, that the farther Arizona moves from the era of common law crimes, the more difficult it becomes for parties and courts to compare a modern statutory crime with common law offenses.

7

right to trial by jury, we consider whether a modern crime has a common law antecedent. We regard a jury-eligible, common law offense as an antecedent of a modern statutory offense when the modern offense contains elements comparable to those found in the common law offense. *See Bowden*, 26 Ariz. at 490, 226 P. at 550.

¶11 In *Bowden*, for instance, we determined that a defendant charged with operating a poker game in violation of a city ordinance was entitled to a jury trial because the charge was similar in character to the common law crime of conducting or maintaining a gambling house and the elements of the crimes were substantially similar. 26 Ariz. at 490, 226 P. at 550.

¶12 Similarly, in *Urs v. Maricopa County Attorney's Office*, the court of appeals concluded that reckless driving, defined in A.R.S. § 28-693.A (Supp. 2000) as "driv[ing] a vehicle in reckless disregard for the safety of persons or property . . . ," is in the "character of operating a motor vehicle so as to endanger [any] property [or] individual," which was a jury-eligible offense at common law. 201 Ariz. 71, 74 ¶ 8, 31 P.3d 845, 848 (App. 2001) (quotations omitted). Because the elements of these offenses are substantially similar, the

8

court held that reckless driving is a jury-eligible offense under Arizona's constitution.[4]

**B.**

¶13     If an offense does not have a common law antecedent, determining whether the Arizona Constitution requires a trial by jury depends upon whether the offense falls within the guarantee of Article 2, Section 24, which provides in pertinent part:

> In criminal prosecutions, the accused shall have the right to . . . a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed . . . .

Ariz. Const. art. 2, § 24.  Because Section 24 is Arizona's analog to the Sixth Amendment of the United States Constitution,[5] we have construed it consistently with the federal constitution to preserve the right to jury trial only for "serious," as opposed to "petty," crimes.  *See Rothweiler*, 100 Ariz. at 41,

_____

[4]     *See also, e.g., City Court v. Lee*, 16 Ariz. App. 449, 494 P.2d 54 (1972).  There, the court found that a Tucson ordinance prohibiting all-nude dancing had a direct antecedent in the common law offense of indecent exposure, which was defined as "[t]he exhibition of one's private parts in a public place." *Id.* at 452, 494 P.2d at 57 (citations omitted).  Although the court also found that the ordinance involved a crime of moral turpitude, that portion of the analysis was unnecessary.  Once a court determines that a common law antecedent for which a jury trial was granted prior to statehood exists for a criminal offense, the inquiry is concluded, and the matter must be tried to a jury.

[5]     "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI.

410 P.2d at 482 ("This Court has consistently held that the right as guaranteed in the Constitution does not apply to petty offenses."); *Schick v. United States*, 195 U.S. 65, 70 (1904) ("[I]t is obvious that the intent [of the framers] was to exclude from the constitutional requirement of a jury the trial of petty criminal offenses."). In *Rothweiler*, we noted two factors relevant to the determination of seriousness: (1) severity of the penalty and (2) moral quality of the act. 100 Ariz. at 42, 410 P.2d at 483.

**1.**

¶14 The United States Supreme Court long followed a case-by-case approach to determine the seriousness of an offense for purposes of the right to trial by jury. *See Baldwin v. New York*, 399 U.S. 66 (1970); *Duncan v. Louisiana*, 391 U.S. 145 (1968); *District of Columbia v. Clawans*, 300 U.S. 617 (1937); *Schick*, 195 U.S. 65; *Callan v. Wilson*, 127 U.S. 540 (1888). These decisions "focused on the nature of the offense and on whether it was triable by a jury at common law." *Blanton*, 489 U.S. at 541. Central to the analysis of the nature of the offense was the Court's understanding that the seriousness of the offense and the severity of the penalty attached to that offense are mutable and dependent on the standards of each generation. Thus, the Court's analysis reflected a willingness to adapt the jury right to the changing sensibilities of the

10

culture. *See Clawans*, 300 U.S. at 627 (recognizing that "commonly accepted views of the severity of punishment by imprisonment may become so modified that a penalty once thought to be mild may come to be regarded as so harsh as to call for the jury trial").

¶15    As its Sixth Amendment jurisprudence developed, the Court began to define a more objective standard for determining seriousness. In its decisions, the Court moved toward increased emphasis upon the severity of the penalty attached to an offense. Whereas the Court had in 1937 "refused to *foreclose* consideration of the severity of the penalty as an element to be considered in determining" whether a statutory offense is serious enough to warrant a jury trial, *Clawans*, 300 U.S. at 625 (emphasis added), by 1970 the Court held that the "most relevant such criteria [is] the severity of the maximum authorized penalty." *Baldwin*, 399 U.S. at 68.

¶16    In *Blanton*, the Court took a definitive step toward creating an objective standard by abandoning its previous case-by-case analysis of seriousness in favor of a bright-line rule for determining jury eligibility under the Sixth Amendment. The Court held that any offense for which the maximum statutory penalty is less than six months incarceration is presumptively a petty offense to which the right of trial by jury does not attach. 489 U.S. at 543. The Court also held, however, that a

11

defendant could rebut this presumption by showing that the legislature had "pack[ed] an offense it deems 'serious' with onerous penalties that nonetheless do not puncture the 6-month incarceration line." *Id*. (quotations omitted).

¶17    In *Blanton*, the Supreme Court recognized that "[i]n fixing the maximum penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense.'"  *Id*. at 541 (quoting *Frank v. United States*, 395 U.S. 147, 149 (1969)).  Because the legislature, acting as a representative body, responds to changing mores and values of the society it represents, the Court declined to substitute its own judgment as to the seriousness society attaches to a particular offense for that of the legislature.  *See id.*  Thus, the Court abandoned the somewhat subjective common law approach for a bright-line test that focuses on the severity of the penalty attached to an offense.

## 2.

¶18    During the first fifty years of Arizona's statehood, our serious offense analysis essentially mirrored that of the United States Supreme Court and focused primarily upon the nature of the offense and whether the common law afforded a right to a jury trial.  As the Supreme Court began focusing upon the severity of the penalty rather than the nature of the

12

offense, we also began to make this transition. Thus, in *State v. Cousins*, 97 Ariz. 105, 397 P.2d 217 (1964), this court first addressed the question whether an offense for which no common law antecedent existed might nevertheless be jury-eligible as a result of the severity of the penalty attached to that offense. In *Cousins*, we held that a maximum punishment of a $300 fine and up to three months incarceration did not constitute punishment sufficiently severe to require a jury trial for the offense of drunk and disorderly conduct.[6] *Id.* at 109, 397 P.2d at 219. In so holding, we relied upon the United States Supreme Court's decision in *Clawans*. *Id.*

¶19 In *Rothweiler*, we expanded this analysis to include consideration of statutory consequences other than the length of incarceration and amount of the fine imposable. Thus, we held that a charge of misdemeanor driving under the influence of intoxicating liquor[7] qualified as a serious offense triable to a jury in part because the defendant faced not only incarceration and a fine but also the potential suspension of his driver's license. 100 Ariz. at 44, 410 P.2d at 484. Because of the "grave consequences" resulting from such a suspension, as well

_____

[6] We reached this conclusion only after we first determined that drunk and disorderly conduct had no jury-eligible common law antecedent. *Cousins*, 97 Ariz. at 107-08, 397 P.2d at 218.

[7] At the time, A.R.S. § 28-692 defined misdemeanor D.U.I. The offense currently is described in A.R.S. § 28-1381 (2004).

13

as the moral quality of the act, we concluded that the penalty was so severe as to require a jury trial for the offense. *Id*.

¶20 During the interim between our *Rothweiler* decision in 1966 and the Supreme Court's decision in *Blanton* in 1989, we decided several cases in which we relied on federal law in declining to extend the right to trial by jury to misdemeanors punishable by no more than six months incarceration. *See Goldman*, 111 Ariz. at 432, 531 P.2d at 1139 ("The denial of a jury trial for offenses the punishment for which does not exceed a $300 fine nor six months in jail does not present a federal constitutional question. Nor does the Arizona Constitution . . . require a jury trial in petty offenses.") (citing *Baldwin*, 399 U.S. 66); *State ex rel. Baumert v. Superior Court*, 127 Ariz. 152, 154–55, 618 P.2d 1078, 1080–81 (1980) (noting that "[i]t is the law, federal and state, that a possible penalty of a 6-month jail sentence is not so severe as to require trial by jury" and finding a $1,000 fine not serious enough to require a jury trial) (citing *Muniz v. Hoffman*, 422 U.S. 454 (1975)); *Spitz v. Mun. Court*, 127 Ariz. 405, 408, 621 P.2d 911, 914 (1980) (noting the federal rule that a jury is not required when the punishment is no more than six months incarceration and holding that "an additional sanction, such as suspension of [a] liquor license . . . does not mandate a jury trial") (citing *Duncan v. Louisiana*, 391 U.S. 145 (1968)). Not

14

until our post-*Blanton* decisions did our analysis begin to diverge from that of the United States Supreme Court.

## C.

¶21    Although we have declined to adopt the *Blanton* analysis, we have moved toward a more objective, bright-line test for determining seriousness of an offense, the second prong of the *Rothweiler* test.  We have held, for example, that "the most significant element [in determining whether an offense is jury eligible] is always the potential punishment authorized by the statute creating the crime . . . ." *Strohson*, 190 Ariz. at 124, 945 P.2d at 1255.  Moreover, we have held that "[a]s a general rule, the penalties attendant to misdemeanor offenses in this state are, of themselves, not enough to secure a jury trial." *Benitez*, 198 Ariz. at 94 ¶ 13, 7 P.3d at 103.  We now expressly adopt the *Blanton* presumption and hold that when the legislature classifies an offense as a misdemeanor and punishable by no more than six months incarceration, we will presume that offense to be a petty offense that falls outside the jury requirement of Article 2, Section 24 of the Arizona Constitution.  By adopting that approach, we leave to the legislature primary responsibility for determining, through its decision as to the penalty that accompanies a misdemeanor offense, whether the offense qualifies as a "serious offense." Like the Court in *Blanton*, however, we recognize that some

15

criminal offenses give rise to direct consequences that render punishment "severe," even though the legislature sets the maximum period of incarceration at six months or less. Article 2, Section 24 guarantees a jury trial if a defendant can demonstrate that additional grave consequences that attend a misdemeanor conviction reflect a legislative determination that the offense is indeed "serious."

¶22    Our previous decisions establish that not every consequence that follows a criminal conviction qualifies for consideration under Article 2, Section 24. To rebut the presumption that an offense does not require a jury trial, a defendant must establish that a consequence of conviction meets several criteria.

¶23    First, the penalty must arise directly from statutory Arizona law. *See Blanton*, 489 U.S. at 543 n.8 (holding that in a serious offense analysis, a court should consider only penalties resulting directly from state action). As we explained in *Strohson*, it is neither practical nor possible for "a state court to conjure up all possible consequences that might flow from a state court conviction when those consequences do not flow from the law of the state." 190 Ariz. at 125, 945 P.2d at 1256. Likewise, courts cannot conjure up all possible consequences that might result from non-statutory sources. Judges who are hard-pressed to "delve into the complexities of

16

federal law in each case to determine whether the individual defendant is entitled to a jury trial," *id.,* would find it even more difficult to conjure up every possible societal repercussion a defendant might face upon conviction of a misdemeanor criminal offense.[8]

¶24      Second, the consequence must be severe. *See Benitez*, 198 Ariz. at 96-97 ¶ 26, 7 P.3d at 105-06 (recognizing driving as a privilege rather than a right and holding that the "potential loss of the driving privilege [was not] a grave or serious consequence"). To mandate a jury trial, collateral consequences must "approximate in severity the loss of liberty that a prison term entails." *See Blanton*, 489 U.S. at 542. Thus, for example, we have previously held insufficient to prove seriousness a $1,000 fine, *Baumert*, 127 Ariz. at 155, 618 P.2d at 1081, or the potential loss of a liquor license, *Spitz*, 127 Ariz. at 408, 621 P.2d at 914.

¶25      Finally, we will consider only those consequences that apply uniformly to all persons convicted of a particular offense. As we stated in *Strohson*:

> [W]e have never determined jury eligibility based upon
> an analysis of the individual defendant before the
> court.  If we were to do so . . . we would have the

_____

[8]      To the extent our decision in *State ex rel. Dean v. Dolny*, 161 Ariz. 297, 778 P.2d 1193 (1989), came to a contrary conclusion regarding grave consequences, we now expressly overrule it.

17

> anomalous situation where some persons would be entitled to a jury trial and others would not, although charged with exactly the same substantive Arizona crime.

190 Ariz. at 125, 945 P.2d at 1256. In other words, when determining the right to jury trial, we are concerned with the seriousness of the offense, rather than with the impact of a conviction on an individual defendant. For example, we will not consider the effect a conviction might have upon a defendant's ability to obtain or maintain certain professional licenses, as such a consequence does not affect all defendants convicted of an offense.

¶26 The modified version of the *Blanton* test that we adopt today preserves the right to jury trial for serious offenses, while recognizing the legislature's primary responsibility for classifying crimes as to severity. We also retain a defendant's right to a jury trial for a misdemeanor offense if the defendant can establish that conviction results in additional severe, direct, uniformly applied, statutory consequences.

### D.

¶27 Unlike the first two prongs of the *Rothweiler* test, the final *Rothweiler* factor—moral quality of the offense—possesses no discernable constitutional pedigree.

¶28 We first announced the moral quality test in *Rothweiler* in response to language in *Clawans,* where the Supreme

18

Court observed that "those standards of action and of policy which find expression in the common and statute law may vary from generation to generation." 300 U.S. at 627. Agreeing with the Supreme Court that an analysis of the constitutional right to jury trial requires reference to the changing standards of seriousness and severity from generation to generation, we found preferable a flexible test that would allow us to consider those changing standards within Arizona. We intended that the subjective "moral quality" prong provide that flexibility. *See Benitez*, 198 Ariz. at 95 ¶ 17, 7 P.3d at 104 (finding recognition of a right to jury trial for crimes of moral turpitude logically consistent with the theory that a jury reflects societal morality and therefore is best equipped to decide the fate of one who is charged with offending that morality).

¶29 As initially set forth in *Rothweiler*, the moral quality factor focused more upon the nature of the offense than on the character of the defendant. 100 Ariz. at 44, 410 P.2d at 484-85. Thus, in that case we held that driving under the influence of intoxicating liquor was a "matter of statewide concern" and "repugnant to the community . . . because of the potential harm and evil that may result from such practice." *Id.*

¶30      In subsequent cases, we expanded the moral quality prong beyond the scope of its initial purpose. Only two years after our *Rothweiler* decision, we began to transform the moral quality analysis into a "moral turpitude" test, shifting our focus from the nature of the crime and toward the nature of the defendant's character and conduct. *See O'Neill v. Mangum*, 103 Ariz. 484, 485, 445 P.2d 843, 844 (1968) (finding that "it can hardly be suggested that one charged or guilty of mere 'drunk and disorderly' conduct is a depraved and inherently base person"). In *Dolny*, we expanded the moral quality test even further, concluding that while we were "undoubtedly concerned with the stigma associated with certain crimes" in *Rothweiler*, the moral quality test is concerned primarily with "the nature of the *consequences* resulting from a conviction, such as . . . losing one's driver's license." 161 Ariz. at 300, 778 P.2d at 1196 (emphasis added). In *Benitez*, we expanded upon the definition of acts of moral turpitude originally pronounced in *O'Neill* to include "actions which 'adversely reflect on one's honesty, integrity, or personal values.'" 198 Ariz. at 95 ¶ 15, 7 P.3d at 104 (citations omitted).

¶31      As the "moral quality" test became more subjective and ambiguous, inconsistent outcomes resulted. *Compare Strohson*, 190 Ariz. 120, 945 P.2d 1251 (holding that misdemeanor assault classified as domestic violence is not a crime of moral

20

turpitude), *and Bazzanella v. Tucson City Court*, 195 Ariz. 372, 988 P.2d 157 (App. 1999) (finding misdemeanor child abuse not a crime of moral turpitude), *with State v. Superior Court*, 121 Ariz. 174, 589 P.2d 48 (App. 1978) (holding that misdemeanor shoplifting *is* a crime of moral turpitude), *and Frederickson v. Superior Court*, 187 Ariz. 273, 928 P.2d 697 (App. 1996) (finding leaving the scene of an accident to be a crime of moral turpitude). Moreover, "[b]ecause the 'moral quality of the act' is in the eye of the beholder, there [seemed to] be as many diverse results as there [were] judges." *Benitez*, 198 Ariz. at 97 ¶ 32, 7 P.3d at 106 (Martone, J., concurring).

¶**32**     We can no longer justify use of the "moral quality" prong of *Rothweiler* to determine whether one charged with a misdemeanor criminal offense is entitled to a trial by jury. The test, as developed and applied, has caused inexplicable results that depend upon the evaluation by a judge that a particular crime involves "moral turpitude" or upon a judge's conclusion that only a "depraved and inherently base person" would commit a particular offense. As *Blanton* makes clear, the Sixth Amendment does not require application of any "moral quality" test and, for the reasons set out above, we conclude that the Arizona Constitution does not require such an approach.

¶**33**     We recognize that the doctrine of *stare decisis* cautions against overruling a former decision. *See Goldman*, 111

21

Ariz. at 432-33, 531 P.2d at 1139-40. In this instance, however, our decision to overturn a portion of our holding in *Rothweiler* does not offend the principles underlying *stare decisis.* As we have previously noted, s*tare decisis* "is grounded on public policy that people should know what their rights are as set out by judicial precedent and having relied on such rights in conducting their affairs should not have them done away with by judicial fiat." *White v. Bateman*, 89 Ariz. 110, 113, 358 P.2d 712, 713-14 (1961). We have also acknowledged, however, that "the doctrine of stare decisis should not require a slavish adherence to authority . . . ." *Goldman*, 111 Ariz. at 432, 531 P.2d at 1139.

**¶34** Our concern for following earlier authority is minimized when, as here, the prior rule has not provided the consistency the doctrine of *stare decisis* is designed to protect. Rather than provide consistency, the moral quality prong of *Rothweiler* has caused continuing uncertainty for parties and courts as they try to determine which misdemeanor offenses satisfy this portion of the *Rothweiler* test. By eliminating the moral quality prong of the *Rothweiler* analysis, we provide assurance for both defendants and the State that the right to jury trial for an offense will not vacillate depending upon the ability of a given judge "to predict the moral

culpability the public attaches to an act." *Benitez*, 198 Ariz. at 97 ¶ 32, 7 P.3d at 106 (Martone, J., concurring).

¶35    Derendal argues that we cannot abandon the moral quality prong of *Rothweiler* without severely curtailing the right to jury trial in Arizona. History does not support such a conclusion. In fact, despite the continuous expansion of the moral quality prong of *Rothweiler*, this court has never held an offense to be jury-eligible solely on the basis of moral turpitude. Moreover, during the almost forty years since the *Rothweiler* decision, the court of appeals has explicitly labeled only four misdemeanor offenses as crimes of moral turpitude. *See City Court v. Lee*, 16 Ariz. App. 449, 494 P.2d 54 (1972) (bottomless dancing); *State v. Superior Court*, 121 Ariz. 174, 589 P.2d 48 (shoplifting); *Mungarro v. Riley*, 170 Ariz. 589, 826 P.2d 1215 (App. 1991) (false reporting to law enforcement agency); *Frederickson*, 187 Ariz. 273, 928 P.2d 697 (leaving the scene of an accident). In two of these cases, the appellate court also found the offense to have a common law antecedent requiring a jury trial. *Lee*, 16 Ariz. App. at 452, 494 P.2d at 57 (bottomless dancing related to common law indecent exposure); *State v. Superior Court*, 121 Ariz. at 176, 589 P.2d at 50 (shoplifting related to common law larceny). Thus, while our decision today should substantially reduce uncertainty as to which offenses merit a trial by jury, it will have little effect

23

upon the number of offenses for which our constitution mandates a jury trial.

### III.

¶36     We hold that the analysis of jury eligibility for trials of misdemeanor offenses in Arizona requires a two step process.  First, Article 2, Section 23 requires that a court determine whether a statutory offense has a common law antecedent that guaranteed a right to trial by jury at the time of Arizona statehood.  In making that decision, the court should consider whether substantially similar elements comprise the common law offense and the offense charged.  If so, the inquiry concludes, and the defendant's right to a trial by jury is established.

¶37     If, however, the court finds no common law antecedent for which a jury trial was required, the court must analyze the seriousness of the offense under Article 2, Section 24.  Because this provision is Arizona's analog to the Sixth Amendment, we apply a modified *Blanton* test.  If the legislature has defined an offense as a misdemeanor punishable by no more than six months incarceration, we presume that the offense is petty, and no jury right attaches.  A defendant may rebut this presumption, however, by demonstrating that the offense carries additional severe, direct, uniformly applied, statutory consequences that reflect the legislature's judgment that the offense is serious.

24

If a defendant makes that showing, Article 2, Section 24 guarantees a right to trial by jury.

## IV.

¶38    Applying this test to the case at hand, we agree with the court of appeals that drag racing, as prescribed by A.R.S. § 28-708.A, is not a jury-eligible offense. Derendal argues that drag racing is related to reckless driving, which has been held to be a jury-eligible offense because it had a common law antecedent that was jury-eligible. Thus, according to Derendal, drag racing also must be tried to a jury.

¶39    The test for determining whether a modern offense is of the same character as a common law offense is whether the modern offense shares substantially similar elements with the common law offense, not whether the offense in question relates in some way to another modern offense for which a jury-eligible common law antecedent exists. As the court of appeals noted, it had regarded reckless driving as a jury-eligible offense because the element of reckless disregard compares with the common law offense of operating a vehicle in a manner that endangers individuals or property. *Derendal v. Griffith*, 207 Ariz. 51, 55 ¶ 16, 83 P.3d 51, 55 (App. 2004). The statute prohibiting drag racing does not include the element of reckless disregard, and we find no other common law antecedent. Thus, Article 2,

25

Section 23 does not require that a charge of drag racing be tried to a jury.

**¶40**     We next inquire whether, under Article 2, Section 24, drag racing qualifies as a serious offense.  Because drag racing is a class one misdemeanor punishable by no more than six months incarceration, we presume that it is not a jury-eligible offense.    To overcome that presumption, Derendal must demonstrate additional severe, direct, uniformly applied, statutory consequences of conviction for the offense.  At the trial court, Derendal argued that the potential loss of his driver's license upon conviction qualifies as a grave consequence and shows that the legislature views drag racing as a serious crime.  We previously have rejected that argument, holding that the potential loss of the driving privilege does not qualify as a serious consequence necessitating a jury trial.  *Benitez*, 198 Ariz. at 96-97 ¶ 26, 7 P.3d at 105-06.[9]  We therefore hold that Derendal has failed to show severe, direct, uniformly applied, statutory consequences and that drag racing is not a jury-eligible offense.

---

[9]   Derendal faces the same statutory consequences as Benitez faced: up to six months incarceration, a possible fine of $2,500, and potential loss of his driver's license for up to ninety days.  *See Benitez*, 198 Ariz. at 92 ¶ 1, 7 P.3d at 101.

**V.**

¶**41**     For the foregoing reasons, we vacate the decision of the court of appeals and affirm the order of the municipal court and judgment of the superior court denying Derendal a jury trial.

_____
Ruth V. McGregor
Vice Chief Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice